# Exhibit F

NH CIRCUIT COURT
2017 JUL 17 P 12:40

THE STATE OF NEW HAMPSHIRE

CHESHIRE, SS

PROBATE COURT

**Valerie C. Santilli, individually and as Executrix of the Estate of John C. Chakalos, Elaine Chakalos, and Charlene Gallagher, Petitioners**

**v.**

**Nathan James Carman, Respondent**

**Petition for Declaratory Judgment, Replevin, Restitution and Other Equitable Relief, and to Impose a Constructive Trust**

## INTRODUCTION

This is an equity petition. The daughters of John C. Chakalos wish to pursue a "slayer" action against the person they believe intentionally killed their father. They ask this court to declare that the murderer was Nathan Carman—John's grandson, their nephew—and that Nathan committed this heinous act out of malice and greed.

The Petitioners seek to impose a constructive trust over that portion of John's Estate which, absent any other action before the Estate is closed, will flow to a trust for Linda Carman, Nathan's mother. Linda is currently missing. She was last seen in Nathan's boat, departing on a fishing expedition with Nathan. Only Nathan returned. Without action against him, that portion of John's Estate designated for Linda will pass to Nathan's benefit and he will be unjustly enriched.

His aunts seek to prevent that unjust result. Accordingly, the Petitioners seek such remedy in restitution, replevin, or equity as this court deems fair and just.

## PARTIES

1.  Valerie C. Santilli is one of the four daughters of John C. Chakalos ("John"). On August 28, 2014, this court appointed Valerie as Executrix of John's Will, which is currently being probated by this court. *See* Estate of John C. Chakalos, Case Number 313-2014-ET-000187.

2.  The beneficiaries of the Estate include Ms. Santilli, Elaine Chakalos, Charlene Gallagher, and Linda Carman, the three other daughters of John C. Chakalos. Additional beneficiaries of the Estate include trusts created for the benefit of John's four daughters and their descendants, in turn.

3.  Linda Carman is not joining this Petition. Her whereabouts are unknown.

4.  The Respondent named in this Petition is Nathan James Carman ("Nathan"), John's grandson.

## JURISDICTION

5.  This matter concerns the probate of a will, the administration and distribution of the estate of a deceased person, and a declaratory judgment to determine a question between the parties. The court therefore has exclusive jurisdiction pursuant to RSA 547:3(I)(a), (b), and (m).

6.  The court has both *in personam* and *in rem* jurisdiction in this matter.

7.  As there exists no plain, adequate and complete remedy at law for the issues addressed herein, the court has the powers of a court in equity pursuant to RSA 547:3-b.

## VENUE

8.  John C. Chakalos was a resident of West Chesterfield, New Hampshire at the time of his death. Administration of his Estate is ongoing in this court. Therefore, venue for this matter is proper in this court pursuant to RSA 547:8 and 9.

## BACKGROUND FACTS

### A. The Murder of John C. Chakalos

9. John C. Chakalos was murdered in his bed in Windsor, Connecticut in the early morning hours of December 20, 2013. He suffered three bullet wounds, at least one of which came from a .308 caliber weapon.

10. No one has been charged in connection with the murder, although Nathan is widely considered to be the prime suspect.

11. On information and belief, prior to John's murder, he and Nathan argued about money and other issues, including John's plans for his home in West Chesterfield, New Hampshire.

12. The Windsor Connecticut Police Department and the Connecticut State Police Major Crimes Squad, with assistance from the Connecticut State Police Forensic Laboratory and the Federal Bureau of Investigation, investigated John's murder.

13. According to the investigators, Nathan purchased a Sig Sauer 716 Patrol .308 caliber semi-automatic rifle from a gun store in New Hampshire prior to John's murder. This is the same caliber weapon used to kill John. Nathan concealed this information from investigators and failed to disclose his purchase of the Sig Sauer semi-automatic during interviews with Windsor Police. On information and belief, Nathan now claims that the weapon is missing.

14. The Sig Sauer 716 Patrol .308 is not a hunting or personal protection gun. It is a semi-automatic assault rifle that costs, with equipment, approximately $3,000. The manufacturer describes this weapon as "built for harsh tactical environments." It is over three feet long, and weighs almost ten pounds. "Losing" such a weapon—and all of the ammunition and equipment that came with it—would be an extraordinary act.

15. The investigators concluded that Nathan had dinner with John on December 19, 2013, and was the last person to see him alive that evening.

16. The investigators noted various methods of cleaning up the crime scene, observing that the wrongdoer appeared to have studied how to remove incriminating evidence from the scene in an effort to elude identification and subsequent arrest and prosecution.

17. In addition, the investigators discovered several inconsistencies in Nathan's description of his activities and the events during the time period surrounding this homicide. Indeed, many of the inconsistencies fall during the time period from approximately 10:00 PM on December 19, 2013 to approximately 8:00 AM on December 20, 2013, which is when investigators believe John was murdered. And Nathan has failed to account for a period of over an hour between midnight and dawn on December 20, 2013.

18. The investigators also discovered that Nathan had discarded the hard drive of his computer as well as his motor vehicle's Global Positioning System ("GPS") unit used on the morning of December 20, 2013, two important pieces of evidence.

19. Nathan has since refused to grant police investigators any further interviews or to submit to a polygraph test.

20. The facts uncovered to date warrant a finding that Nathan killed his grandfather.

**B. The Disappearance of Linda Carman**

21. On information and belief, shortly before midnight on September 17, 2016, Nathan and his mother boarded Nathan's 31-foot boat (the "Chicken Pox") at the Ram Point Marina in Rhode Island for a fishing trip. Prior to leaving shore, Nathan had removed the trim tabs from the boat, which left patched holes that made the boat more dangerous and easier to sink.

22. On information and belief, Linda was led to believe that she and Nathan would fish for striped bass near Block Island in Long Island Sound and that they would return to the marina on September 18, 2016.

23. On information and belief, the Chicken Pox was equipped with navigational and safety equipment, including a radar, a two-way VHF radio, and an Emergency Position Indicating Radio Beacon ("EPIRB"). A reasonably prudent owner of a boat such as the Chicken Pox would also have equipped the boat with an Automatic Identification System ("AIS") receiver and transponder. Nathan may have—and indeed should have—included an AIS on the Chicken Pox. The vessel was also equipped with a GPS unit.

24. If the Chicken Pox were in distress, the EPIRB could have been activated by simply turning a switch. The EPIRB would have then sent a distress signal indicating the boat's position. The U.S. Coast Guard would direct rescue vessels or aircraft to that position. In addition, the two-way radio could easily be used to call for help. If the Chicken Pox was equipped with an AIS, and it should have been, the AIS would have constantly broadcast the boat's name and position. The U.S. Coast Guard could have used that information to find the Chicken Pox or any survivors.

25. On information and belief, Linda had her cell phone with her on the trip. That cell phone emits pings from which the location of the cell phone may be determined. Linda's cell phone sent its last ping when it was about 10 nautical miles south southwest of Block Island.

26. According to Nathan, he noticed trouble the morning of September 18, 2016. He entered the wheelhouse and grabbed his bag of provisions. He did not turn on the EPIRB. He did not use the radio to issue a distress call. If he had an AIS, he did not turn on its transponder.

27. On information and belief, if the Chicken Pox had filled with water, the free surface effect of the water would have changed the way the boat acted in the sea. The boat would have been sluggish. It would have returned very slowly from each roll. This very noticeable change would have alerted Nathan that something was wrong. Nathan could have issued a distress call long before the water reached the level necessary to sink the Chicken Pox.

28. On information and belief, Nathan put on one of the boat's life jackets; he never gave one to his mother. He deployed and entered the Chicken Pox's sole life raft, with his bag of provisions. He left his mother behind.

29. When Linda did not return as expected on September 18, 2016, one of her friends contacted the U.S. Coast Guard, which started a search and rescue operation. The Coast Guard did not have EPIRB information. Nor did it receive a distress call via VHF radio. On information and belief, Linda's friend informed the Coast Guard that Linda and Nathan were fishing near Block Island.

30. The Army Corps of Engineers, the Rhode Island Department of Environmental Management, and the Narragansett Bay Task Force joined the Coast Guard in a lengthy, massive search.

31. The search was called off on Saturday, September 24, 2016—a week after Nathan and Linda had departed. The following day, a merchant vessel, the M/V Lucky Orient, found Nathan in a life raft about 45 nautical miles south of the shipping lanes and about 106 nautical miles south of Martha's Vineyard.

32. On information and belief, prior to departing with Linda, Nathan had told neighbors at his marina that he intended to fish for tuna in Block ***Canyon***, south of the Continental Shelf, far from commercial shipping lanes, and about 86 nautical miles from Point

Judith, Rhode Island. The life raft could not have drifted from Block Canyon to the position where Nathan was rescued.

33. No one has seen Linda since she boarded the Chicken Pox with Nathan on September 17, 2016.

**C. John Chakalos's Estate Plan, and how Nathan stands to benefit from it.**

34. The Will of John C. Chakalos is currently being probated through the Estate before the court. (For ease of reference, a copy is attached hereto as **Exhibit A**.)

1. The Revocable Trust

35. Under the Will, John's residuary estate flows to the John C. Chakalos Revocable Trust ("the Revocable Trust," **Exhibit B**). The situs of the Revocable Trust is in New Hampshire. The Revocable Trust is governed by New Hampshire law.

36. The Trustees of the Revocable Trust are directed to distribute $4 million to the Rita B. Chakalos New Hampshire Personal Residence Trust ("the QPRT"). After payment of debts, taxes, and expenses of the Estate, and distribution of $4 million to the QPRT, the balance of the remaining trust corpus is divided into separate shares for each of John's daughters who survive him.

37. Each share is to be distributed to the Trustees of the Chakalos Family Dynasty Trust (the "Dynasty Trust", **Exhibit C**), to be held in accordance with the separate management subtrusts created for each daughter under Article I of the Dynasty Trust.

2. The Dynasty Trust

38. Under Article I of the Dynasty Trust, each daughter is the sole beneficiary of her own, respective, separate management subtrust during her lifetime. The situs of the Dynasty Trust is New Hampshire and it is governed by New Hampshire law.

39. Under Article I, each daughter has a testamentary power, exercisable at death, to appoint the beneficiary of the remaining trust property of her separate management subtrust. Unless that testamentary power is exercised, the remaining corpus of each daughter's management subtrust at the time of her death will continue in further trust for her living descendants.

40. Nathan is Linda's only living descendant.

41. On information and belief, Linda relinquished her testamentary power of appointment. Accordingly, upon Linda's death, the property of her separate management subtrust will pass to a trust for the benefit of Nathan during his lifetime, and then to further remainder beneficiaries upon his death.

42. Once the Estate is distributed and closed, several million dollars will flow to the Dynasty Trust and into Linda's separate management subtrust. Those assets will ultimately benefit Nathan.

43. On information and belief, Nathan had a copy of the Dynasty Trust well before John's murder.

3. The Joint Account

44. Prior to his death, John established a bank account containing approximately $400,000 ("the Joint Account"). On information and belief, at various times, he, Nathan, and Linda were the owners, with rights of survivorship. Upon John's death, Nathan and Linda became owners of the Joint Account. Linda later transferred her interest to Nathan and he became the sole owner of the Joint Account.

4. <u>The Estate Plan is Frozen in Place.</u>

45. Because of John's untimely death, he lost the right to change his estate plan, including control over the ultimate distribution of the Dynasty Trust and the ownership of the Joint Account. Nathan's actions froze John's estate plan at a time when it was structured to provide millions of dollars for Nathan's benefit.

46. There may be other instruments and accounts which benefit Nathan, of which the Petitioners are currently unaware. If so, those assets may also have unjustly enriched the slayer.

**COUNT I – DECLARATORY JUDGMENT**

47. Each paragraph above is incorporated herein.

48. It would be inequitable for a murderer to profit from his act.

49. The Petitioners believe that Nathan murdered their father, and they ask this court to so find.

50. The Petitioners claim a present equitable right in the assets of the Estate, and bring this Petition against Nathan, a vested beneficiary of trusts to be funded by the Estate, to determine the question as between the parties.

**COUNT II – CONSTRUCTIVE TRUST**

51. Each paragraph above is incorporated herein.

52. It would be inequitable for a murderer to profit from his act.

53. By murdering his grandfather, Nathan deprived John of the enjoyment of his last years, the fruits of his industry, and his family. Nathan also deliberately and intentionally accelerated the flow of assets from his grandfather's estate to his own benefit, and prevented his grandfather from changing his estate plan, had he desired to do so.

54. The killing was intentional and unlawful. A constructive trust should be imposed upon funds that otherwise pass directly to Nathan (or for the benefit of Nathan in trust), as the slayer, and upon the assets from which he would otherwise be unjustly enriched.

**COUNT III – REPLEVIN**

55. Each paragraph above is incorporated herein.

56. It would be inequitable for a murderer to profit from his act.

57. By murdering his grandfather, Nathan received the funds in the Joint Account as surviving joint tenant.

58. The Estate is entitled to seek the return to it of such funds.

59. The Petitioners claim return of such funds, as received by Nathan, by replevin.

**COUNT IV – RESTITUTION AND EQUITABLE RELIEF**

60. Each paragraph above is incorporated herein.

61. It would be inequitable for a murderer to profit from his act.

62. This court is an equity court. Among its equity powers is the authority to order restitution. The court should order restitution and make such other equitable orders as it deems fair and just under these circumstances.

**RELIEF REQUESTED**

WHEREFORE, the Executrix and the individual Petitioners request the Honorable Court:

A. To impose a constructive trust over that portion of the funds which are to flow from the Estate, through the Revocable Trust to the Dynasty Trust, ultimately for the management subtrust for Linda Carman;

B. To impose a constructive trust over that portion of the funds which are to flow from the Estate, through the Revocable Trust, to the QPRT;

C. By the constructive trusts, to preclude Nathan Carman from ever enjoying any direct, indirect, or beneficial interest in those funds;

D. To order Nathan Carman to return those funds from the Joint Account which ostensibly became his upon the death of his grandfather;

E. To exercise its equitable power over any other instrument or account that may be discovered which unjustly enriches Nathan; and

F. To grant restitution and such other and further equitable relief as the Court deems fair and just.

Respectfully submitted,

ELAINE CHAKALOS,
CHARLENE GALLAGHER, and
VALERIE C. SANTILLI, both individually and as Executrix of the Estate

By Their Attorneys:

PRETI FLAHERTY
BELIVEAU & PACHIOS PLLP

Date: July 17, 2017

William C. Saturley, Esq. (NHBA #2256)
PO Box 1318
Concord, NH 03302-1318
Tel: (603) 410-1500
wsaturley@preti.com

HOLLAND & KNIGHT LLP

Date: July 17, 2017

Gordon P. Katz, Esq.
10 St. James Avenue, 11th Floor
Boston, MA 02116
Tel: (617) 573-5839
gordon.katz@hklaw.com

(Subject to approval of *Pro Hac Vice* application)

Date: July 17, 2017

Daniel I. Small, Esq.
10 St. James Avenue, 11th Floor
Boston, MA 02116
Tel: (617) 854-1453
dan.small@hklaw.com

(Subject to approval of *Pro Hac Vice* application)