## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
C.A. NO.: 17-38-WES-PAS

NATIONAL LIABILITY & FIRE INSURANCE CO. and
BOAT OWNERS ASSOCIATION OF THE UNITED STATES,
    Plaintiffs,
vs.
NATHAN CARMAN,
    Defendant.

-----------------------------------------

CERTIFICATE OF NONAPPEARANCE AND
DEPOSITION OF
CHRISTOPHER ROTH, JR.

April 9, 2018
9:54 a.m.

Eastern Bank in Marshfield
1932 Ocean Street
Marshfield, Massachusetts

Lauren S. Gardner, Professional Shorthand Reporter

## Page 2

1  APPEARANCES OF COUNSEL
2
3  ON BEHALF OF PLAINTIFFS:
4      DAVID J. FARRELL, ESQUIRE
5      LIAM T. O'CONNELL, ESQUIRE
6      Farrell & Smith LLP
7      60 Washington Street, Suite 300
8      Salem, Massachusetts 01970
9      508.432.2121
10     Sealaw@live.com
11
12 ON BEHALF OF DEFENDANT:
13     DAVID F. ANDERSON, ESQUIRE
14     Latti & Anderson LLP
15     30-31 Union Wharf
16     Boston, Massachusetts 02109
17     617.523.1000
18     DAnderson@lattianderson.com

## Page 3

1   INDEX OF EXAMINATION
2   Deposition of: CHRISTOPHER ROTH, JR.
3   EXAMINATION                      PAGE NO.
4   By Mr. Farrell                   4, 6, 74
5   By Mr. Anderson                  68
6
7   INDEX OF EXHIBITS FOR CERTIFICATE OF NONAPPEARANCE
8   NO.     DESCRIPTION              PAGE NO.
9   1       Re-Notice of Deposition  4
10  2       Subpoena                 4
11  3       Subpoena                 5
12  4       Court Files              5
13  (Original exhibits retained by Attorney Farrell).
14      INDEX OF EXHIBITS FOR DEPOSITION
15  NO.     DESCRIPTION              PAGE NO.
16  A       List                     43
17  B       Diagram                  43
18  (Original exhibits retained by Attorney Farrell).

## Page 4

1   CERTIFICATE OF NONAPPEARANCE OF CHRISTOPHER ROTH, JR.
2                       APRIL 9, 2018
3                       PROCEEDINGS
4
5       MR. FARRELL: So we're on the record.
6   This is for the deposition of Chris Roth, Junior.
7       It is now 9:54. The deposition was
8   noticed for 9:30 a.m. today and we haven't heard from
9   Attorney Anderson, so I'm just going to mark a couple
10  of exhibits.
11      First, we'll mark as Exhibit 1 the
12  Re-Notice of Deposition.
13      (Exhibit No. 1, Re-Notice of Deposition,
14  marked for identification).
15      MR. FARRELL: We'll mark as Exhibit 2
16  the Subpoena that was served on Mr. Chris Roth,
17  Junior at 713 Webster Street, Marshfield, Mass.
18  02050, which is the address that was provided in
19  Mr. Carman's interrogatory answers. And that'll be
20  Exhibit 2.
21      (Exhibit No. 2, Subpoena, marked for
22  identification).
23      MR. FARRELL: Exhibit 3 is another
24  Subpoena that we had served at 84 North Street,

Page 9

1   there was this kid walking his dog and he just let
2   the dog stop and urinate on the door like it was no
3   problem, didn't, like, tug him away or anything, just
4   let him do his business. And my dad pulled up and
5   saw it and all he asked was, you know, do you mind?
6   And the kid immediately, you know, got an attitude,
7   one thing led to another.
8          I came out because I heard it and -- You
9   know, I'm very protective when it comes to family,
10  especially my old man. You know, he works with his
11  hands for a living, he's the one that teaches me his
12  trade. So without him, I'm, you know, not in the
13  best possible situation I should be. So I -- And he
14  was with a pit bull. I was more scared of the
15  pit bull than I was of him.
16         So to make a long story short, we got in,
17  like -- We exchanged some words because he just kept
18  getting very ignorant with me. And I said listen, I
19  said, all I'm asking you to do is just leave and, you
20  know, apologize. If -- Worse case scenario, just,
21  you know, just leave. So he left.
22         And then my next door neighbor there -- It's
23  actually an industrial shop and there's two houses
24  left on the road that are residential. And the two

Page 10

1   -- The woman that lived next door, it's an old
2   Portuguese family, and I help -- I do my best to,
3   like, help them when I see them because they're
4   always walking to Market Basket. You know, I unload
5   their groceries for them, give them rides when I can,
6   whatever.
7          And as he was walking by, she was walking her
8   three-year-old granddaughter, and she said something
9   to him because she had been having problems with dogs
10  defecating on their lawn. She didn't know who it
11  was, so she said something to him and he looks at her
12  and goes, What'd you say, you F'ing bitch? And I was
13  just -- And I kind of, like, snapped -- I snapped at
14  that point. And, like, I kind of walked up to the
15  kid and was, like, dude, just leave, you know, you've
16  already caused enough trouble on this street. Don't
17  come back to this street, just leave. I had never
18  seen the kid in my life. And like I said, I was
19  working.
20         And so he's like, save that energy. I'll be
21  back, blah, blah, blah. Comes back 15 minutes later
22  with him and two others. My father called the
23  police, the police came. They didn't find anyone.
24  About 30 minutes later, they came back with himself,

Page 11

1   five other men, a younger girl and her boyfriend who
2   were just like standing down, like, videotaping the
3   thing.
4          And then they hopped up on a -- We have a
5   loading dock, not just a drive-in garage door, and
6   the -- They all got up on the loading dock and I told
7   my dad, I said close the door. And the mother, like,
8   pushed me and, like, crossed the threshold of the
9   door. So if we had closed it, she would have been
10  inside of the door. And as soon as -- I kind of,
11  like, just put my arm like this to kind of, like,
12  walk her out without, like, really touching her. And
13  she -- She, like, slapped me in my face. And then
14  the next kid, he sucker-punched me. And then they
15  all just started, like, jumping me. And I fought,
16  like, three of them off on the -- They were a lot
17  smaller than me. But they -- I ended up getting
18  thrown off of the loading dock.
19         And we have a big box fan about this big.
20  It's like a chicken coop fan and -- that we use for
21  dust and whatnot. And that fell off the loading dock
22  and, like, I landed on it, like, my back here, like,
23  so like it -- It was rough.
24         And then -- So any ways, I got to the ground,

Page 12

1   I knew I wasn't getting up, got in the fetal position
2   and just kind of had to take the beating. So my dad
3   got off the loading dock. The kid Justin that was
4   there, he did nothing. And I got stabbed three times
5   and just got stomped out, my head punched in, you
6   know, and then some kid was, like, lining up to
7   Stephen Gostkowski my head, and luckily, my dad got
8   down and grabbed the kid off of me and, you know,
9   threw him. So...
10      Q. When was this?
11      A. February 26th of last year.
12      Q. 2017?
13      A. Yeah.
14      Q. Have you had anything to drink today?
15      A. No.
16      Q. Have you taken any drugs today?
17      A. I'm on the Methadone clinic. Other than
18  that, no.
19      Q. Did you take any Methadone today?
20      A. Yeah, at six this morning.
21      Q. Okay. And how long -- Is it a heroin
22  problem?
23      A. No. Percocets.
24      Q. Okay. And how long have you had that

Page 49

1  things right.
2      Q. So you just followed the directions that were
3  with the trim tabs?
4      A. I followed the directions of the trim tabs
5  and I followed Brian's directions of putting trim
6  tabs on a piece of shit.
7      Q. All right. Now, the question is really, and
8  I just want to -- I want to be precise on this.
9      A. I can tell.
10     Q. There's other places we could look. We could
11 look at the boat on the bottom of the ocean
12 somewhere, too, to find out.
13     A. I'm a good diver.
14     Q. I don't know if you want to dive that deep.
15        Let me ask you if you remember the size of
16 the hole.
17     A. No. I just said that.
18     Q. Okay. Do you remember how many holes you saw
19 your father drill? Two?
20     A. Two for the trim tabs.
21     Q. Okay.
22     A. Now, they're --
23        MR. ANDERSON: Two for each or --
24        THE DEPONENT: No, no, no. One for

Page 50

1  each.
2         MR. ANDERSON: Okay.
3         MR. FARRELL: And you can ask
4  questions, Mr. Anderson, at the end, as I earlier
5  instructed you, on your cross-examination and not
6  now.
7         MR. ANDERSON: Okay. I was just --
8         MR. FARRELL: Because you'll put your
9  foot in your mouth again if you keep it up.
10        THE DEPONENT: It doesn't seem like
11 he's asking questions. It seems like he's just kind
12 of trying to help me because I'm kind of thrown
13 off guard. I was not expecting this.
14    BY MR. FARRELL:
15     Q. He's trying to help you? Mr. Anderson is?
16     A. Well, just like maybe with some wording
17 because I'm getting kind of hung up on my words. I
18 wasn't ready to be, like, interrogated about
19 something I'm trying to help people with.
20     Q. Okay. Now, let me ask you --
21     A. And your attitude towards me is like -- I
22 already don't -- You started off talking about
23 heroin.
24     Q. Well, you know, it's kind of there -- out

Page 51

1  there.
2      A. Oh, no, it definitely is. But I mean, do I
3  -- I'm 220 pounds, like six-foot-three, I don't have
4  marks on my arms, I'm not a junkie, I don't --
5      Q. But you've had marks on your arms.
6      A. I haven't had marks on my arms, no.
7      Q. What about in police reports? Were the
8  police reports inaccurate in saying that they saw
9  marks on your arms?
10        MR. ANDERSON: What police reports
11 are you referring to?
12     A. All right. We can just -- I object.
13     Q. You really don't have --
14     A. I do because I'm --
15        MR. ANDERSON: Yes, he does have
16 standing to object. A witness does have standing to
17 object. A witness has standing to go to the court
18 and ask not to be harassed. I don't have standing to
19 do that.
20     A. Can I ask a question?
21     Q. Maybe. I'm here to ask you questions.
22     A. Maybe? I'm just going to -- Here. You know
23 what? Am I going to be arrested if I leave here?
24        MR. ANDERSON: No. You can go to

Page 52

1  court and ask --
2      A. All right. If you're going to keep treating
3  me the way you're treating me, like I'm some P-on or
4  like I'm some, like, bad person. I work six days a
5  week and I completely changed my life around. You're
6  treating me horribly and I'm trying to help.
7      Q. Sir, I think you're being defensive, overly
8  so. I am not --
9      A. Because someone is coming at me.
10     Q. No, no. Listen, I --
11     A. Just please be respectful. I'll respect you
12 if you respect me. So let's get this done to the
13 best of our ability and move on.
14     Q. The questions can be -- Questions can be
15 challenging in this context.
16     A. But there's some questions that you didn't
17 have to ask. Like, you could have asked me if I did
18 drugs today and if I was under the influence. I am
19 not. Being on Methadone isn't under the influence.
20 It's a maintenance drug that saved my life.
21     Q. I'm going to ask you a couple of things that
22 you said earlier.
23        You said you stepped up -- You stepped up
24 and, what, you reported your views of the boat to