# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

NATIONAL LIABILITY & FIRE INSURANCE CO. :
                           :

        and                          :

                           :

BOAT OWNERS ASSOCIATION OF THE :
UNITED STATES                  :    Civil Action No: 17-38-WES-PAS

                           :

       Plaintiffs,              :    In Admiralty

                           :

v.                             :

                           :

NATHAN CARMAN              :

                           :

           Defendant.         :

## PLAINTIFFS' PRE-TRIAL PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs NATIONAL LIABILITY & FIRE INSURANCE COMPANY ("NLFIC") and

BOAT OWNERS ASSOCIATION OF THE UNITED STATES ("BoatU.S."), the insurers

of Nathan Carman's boat at issue in this case, respectfully submit these pre-trial

proposed findings and conclusions, as directed by the Court on June 14, 2019.

Recognizing that Carman may try to testify differently at trial, most of the below

citations are on topics he has already clearly testified to in his December 16, 2016 pre-

litigation examination under oath ("EUO"); his January 22, July 17, and October 29,

2018 deposition in this case (Dep. I, Dep. II, Dep. III); and his August 27 and 28, 2018

deposition (NH Dep. I, NH Dep. II) in the dismissed New Hampshire case.[1]

Other citations are to documents and photographs which Plaintiffs expect will be

admitted as exhibits at trial.

---

[1] Carman's prior testimony is admissible under Fed. R. Evid. 801(d)(2)(A).

*Table of Contents*

**PROPOSED FINDINGS OF FACT**                                                    3

    Brian Woods' Rebuild of the JC 31'                                       3

    Carman's Boat Purchase                                                   4

    The "All Risk" BoatU.S. Insurance Policy's Terms and Exclusions          5

    Pertinent Policy Provisions                                              9

    Carman's Forward Bulkhead Removal                                        11

    Carman's Recurring Bilge Pump Problems                                   11

    Carman's Half Dollar Holes at the Transom Waterline                      12

    Carman's Incomplete/Improper/Faulty and Unseaworthy Hole Repairs         14

    The Final Voyage:  Which Way Did He Go?                                  16

    Carman's Sinking Story Sinks Him – Killing His Mother                    18

    Carman's Seven Day Life Raft Drift Did Not Happen                        21

    Despite All This, Carman Pursues an $85,000 Insurance Claim              25

    A Look Back at His Grandfather's Murder                                  28

    The Common Motive                                                        32

**PROPOSED CONCLUSIONS OF LAW**                                                  34

    The Policy's Language Applies                                            36

    Carman Did Not Sustain His Burden of Proof                               38

    Complaint, Counts I and II *Carman materially increased his insurers' risk*   40

    Complaint, Counts IV and VI *Carman's faulty, unseaworthy repair*        45

    Complaint, Counts III and V *Not accidental but intentional*             47

    Affirmative Defense 88 *Fraud and Concealment*                           49

    Counterclaim, Counts I and II *No breach of contract by Plaintiffs*      55

    Counterclaim, Counts III and V *No bait and switch*                      56

    Counterclaim, Counts IV and VI *No unfair claim settlement practices*    56

    Conclusion                                                               57

**PROPOSED FINDINGS OF FACT**

**Brian Woods' Rebuild of the JC 31'**

1. Professional boat builder Brian Woods of Plymouth, MA purchased a used lobster boat as a rebuilding project during slow winter months.  Originally the JC 31' plug (used by the manufacturer as the mold for Down East fiberglass hulls), it had a mahogany core sandwiched between fiberglass interior and exterior surfaces, Ex. 1.2.3, and was in need of work, Exs. 12.0, 12.3, 12.5, 12.7.

2. During 2009 the exterior hull was sanded and re-fiberglassed with a gelcoat finish.  Exs. 12.1, 12.6, 12.11, 12.12, 12.13.   Extensive wooden structural members were added in the bilge.  A gas Crusader engine was installed.  Ex. 12.10.

3. The first version of the rebuild added an aluminum foredeck.  Ex. 12.16. But on launching, the boat could not quite get up on plane.  Ex. 12.17.  Therefore, trim tabs (akin to aviation ailerons) were installed on the transom, to assist in trimming the vessel by the bow.  Exs. 12.48, 12.49 (exemplar trim tab).

4. In the course of installing Bennett trim tabs, Woods followed the manufacturer's directions and personally drilled four ½" diameter holes through the transom, about 3-4 inches above the waterline, for thru-hull hydraulic connections to the four actuators which control the pitch of the trim tabs.  Ex. 12.39.  The four ½" diameter holes were below the aft cockpit deck level and opened into the bilge, a few inches below the scuppers which are even with the aft cockpit deck.  Exs. 12.48,12.42.

5. Woods made alterations so he could market a second version of the boat either as an offshore fishing vessel or salvage vessel, with a central aluminum pilot house that could tilt forward for engine access and an ample walk around deck.  Exs.

12.35, 12.36, 12.38, 12.21, 12.33, 12.41 (walk around video).  He included an under-gunwale storage area on either side of the pilot house for fishing rods or equipment, Ex. 5.4.13, at the purchaser's option.  A safer, faster, and more fuel-efficient Cummins diesel engine replaced the gas engine.  Ex. 12.28, 12.29, 12.50.  Deck hatches provided access to a fish box, the bilge, and mechanicals.  Exs. 12.22 (bow), 12.24 (forward of pilot house); 12.27(lazarette); 12.32 (amidships); 12.31 (port cockpit).

6. Woods installed athwartship half bulkheads of marine plywood to port and starboard of the forward fish box.  Exs. 5.4.12, 5.4.11, 12.19, 12.54, 12.55, 12.56.  The curved bottom of the plywood was fiberglassed to the hull in the bilge, the top of the plywood butted to the deck above it, and the inboard perpendicular was tight and sealed against the fish box.  This provided interior structural support for the exterior hull and although not airtight at the top also added two voids for buoyancy and potential storage that could be accessed by deck hatches if the purchaser opted to have them installed.

7. Also pertinent to this case, Woods installed two bilge pumps, one at the stern, Ex. 12.27 and one at the port cockpit hatch, Ex. 12.31.

8.  Woods advertised the boat for sale.  It was named CHICKEN POX during part of the time he was rebuilding it but he removed that and there was no name on the hull when his work was completed.

**Carman's Boat Purchase**

9. In December 2015 Woods sold the boat to Carman who owed $800 of the $48,000 purchase price on taking possession.  Although he was annoyed, Woods agreed to subsequently meet Carman for final payment in front of a notary to witness Woods' signature transferring title.  But Woods thought it so odd for Carman to plan on

running the boat for the first time to Point Judith, RI in December that he videoed the

transit through the Cape Cod Canal to at least confirm that much of Carman's story.

10. Carman initially registered the boat in New Hampshire and then applied for a

new title in Rhode Island, Ex. 5.54, and never did pay Woods the $800 balance due

him.  On figuring this out, Woods found the boat in Point Judith and recovered his

Massachusetts registration plates and dock lines, which Carman reported to the

Narragansett police, who had better things to do.

**The "All Risk" BoatU.S. Insurance Policy's Terms and Exclusions**

11. BoatU.S. operates a Marine Insurance Program as the Managing General

Agent for NLFIC.  *Compare* ECF No. 1 ¶ 9 (complaint) *with* ECF No. 12 ¶ 9 (answer

admits).  Carman insured the boat with Plaintiffs at the time he purchased it.  *Id.* at 17

¶ 30.

12. Regarding the terms of his insurance policy, in his deposition Carman

testified, simply, that "My understanding was I had insurance.  If I suffered a loss that

was not caused intentionally, that I was covered."  Dep. II at 109; Dep. I at 133-34.  This

is neither credible nor reasonable:

a. Before purchasing the policy Carman made phone calls to BoatU.S. and

visited the BoatU.S. Marine Insurance Program website, Counterclaim, ECF No. 12 ¶

15.  The website, Ex. 5.4.22, on its first page, *id.* at P003, states "*All coverage is

subject to the terms, conditions, limits and exclusions of the policy…. Please read your

policy carefully."*  Below that it states "**All coverage is subject to terms, conditions,

limits and exclusions of the policy**" and "(These pages contain only a general

description of coverage.  We recommend you read any policy prior to purchase.)"

Carman had "seen language like this just in general, not necessarily on the BoatUS website, but on buying car insurance, just life in general."  Dep. I at 171.  "*All coverage is subject to the terms, conditions, limits and exclusions of the policy…. Please read your policy carefully"* is repeated, Ex. 5.4.22 at P004.  The top of Ex. 5.4.22 at P005 states *"All coverage is subject to the terms, conditions, limits and exclusions of the policy and the policy language will supercede anything to the contrary."  Id.* at P006 states

> All policies through the BoatU.S. program are 'All Risk' which covers all external causes of loss except those specifically excluded….  To see a copy of the policy before you bind coverage, ask a BoatU.S. insurance specialist to send a sample with your quote.

b. Attached and made a part of Carman's Counterclaim as ECF No. 12-1 is a BoatU.S. INSURANCE QUOTATION dated 12/17/2015 offering a $1,561 premium for coverages including $66,200 for Boat and Boating Equipment (Agreed Hull Value).  It states at the bottom "Policy Type 'All Risk' (Subject to policy limits, warranties and exclusions.)"  It references "App. No.: 3985989-02/  1561."

c. Following approval of a pre-purchase survey, Ex. 1.2.2 at P00331-P00371, , and credit card payment, BoatU.S. issued Carman a MARINE INSURANCE BINDER, No. 3985989/02, which is also attached and made a part of his Counterclaim, ECF No. 12-3.  It states at the top "THIS BINDER IS A TEMPORARY INSURANCE CONTRACT, SUBJECT TO THE CONDITIONS SHOWN ON THE REVERSE SIDE OF THIS FORM."  Further, "the Insurance Application (to be completed and signed by the insured)…must be completed within 30 days of the effective date or coverage will be canceled."[2]  Stated

---

[2] Carman returned a signed application to BoatU.S. February 19, 2016.  Ex. 5.4.3.

on the reverse side under CONDITIONS, "This insurance is subject to the terms, conditions, limitations and exclusions of the policy(ies)" in current use by the Company….   This binder is cancelled when replaced by a policy."  Carman understands this as meaning "there is some kind of policy in current use by the company, and this document is subject to certain parts of that document," specifically, its "terms, conditions, limitations, and exclusions."  Dep. I at 149-50.  At all relevant times BoatU.S. insurance policy forms were also on file with the Vermont Division of Insurance and publicly available.  Ex. 25.6.

d. BoatU.S. Yacht Policy No. 3985989-15 was mailed to Carman's Vernon, VT address.  Exs. 25.3, 25.4.  Enclosed with a 12/23/2015 cover letter from Mike Pellerin, Vice President Underwriting, in pertinent part it includes a YACHT POLICY, a DECLARATIONS PAGE, and a VERMONT ENDORSEMENT TO THE YACHT POLICY.

e. Carman claims not to have received that envelope with the enclosed policy. But he acknowledges U.S. Mail gets wet in his mailbox and his monitoring of it is less than "foolproof."  Because his house is part construction site mail "gets jumbled around" and not always opened.  If his neighbors' mail is delivered to his house by mistake he does not bother giving it to them.  Dep. I at 151-53.[3]

f. Carman and BoatU.S. increased the boat's agreed hull value, to $85,000, by a March 25, 2016 Endorsement following his purchase of an autopilot, chart plotter, VHF radio, Automatic Identification System (AIS), a life raft, and other appurtenances.  Ex.

---

[3] Carman's attorney requires service of discovery by U.S. mail.  Dep. II at 107 ("The reliability of the document system used by this office is dependent upon all discovery papers being received by UPS mail.").

1.4.9.

g. Following some work at Point Judith Marina, on April 26, 2016 Carman ran his boat out to the Point Judith Harbor of Refuge, failing to make sure the seacock for the engine's saltwater cooling system was open and the engine overheated.  Remaining inside the jetties, with no whitecaps or fog, he could see shore, Dep. I at 72-73, because, as he testified, he was "literally within a stone's throw of land."  He felt this predicament urgent enough to call 911 on his cell phone.  NH Dep. II at 66; Dep. I at 65; 5.4.6.  "I set anchor and was towed back into the harbor by the coast guard," Ex. 5.4.4, Carman wrote in making an insurance claim to BoatU.S. for this incident.  With his $24 membership fee, he received a tow at no charge (worth $490, paid by BoatU.S.) from TowBoatU.S. Rhode Island who moved him from where the USCG dropped him off to Point Judith Marina.  Ex. 17.1.  A reconditioned Cummins engine was installed by Point Judith Marina.  In the course of paying the $33,489.33 insurance claim, without depreciation, two letters were sent by BoatU.S. to Carman (which he does not dispute receiving), noting two different exclusions in his policy, Exs. 5.4.23 (Exclusion A) and 5.4.24 (Exclusion C).  Carman testified he remembers reading both letters and "understood that BoatU.S. was saying the language was part of my policy" and did not "think about it in any more depth."  Dep. I at 183-86.

h. After the sinking at issue in this case and after being requested to provide an examination under oath by BoatU.S. letter dated November 11, 2016 quoting that policy provision, Ex. 17.6, neither Carman, Dep. I at 313, nor his prior attorney protested that examination, which took place December 16, 2016.  In fact, by December 30, 2016 letter the prior attorney acknowledged that the BoatU.S. November 11, 2016 letter

"formally invok[ed] the EUO clause of the policy."

i. Prior to the examination under oath Carman requested his insurance policy documents from BoatU.S. and on November 29, 2016 was emailed copies of the original DECLARATIONS PAGE listing various coverages and endorsements, the $85,000 increased hull value endorsement, and a copy of the YACHT POLICY.  Ex. 25.4.

j. During his deposition, Carman was impermissibly coached regarding his understanding of insurance coverage.  Dep. I at 164-67, Ex. 5.1.1 (video).  The reference to Consequential Damage Coverage on the BoatU.S. website that was the subject of the coaching, Ex. 5.4.22 at P004, summarizes Yacht Policy Exclusion A which is not relevant here.

13. In sum, the Court finds that the terms of BoatU.S. Yacht Policy No. 3985989-15 at issue here (the "Policy") is as enclosed in Pellerin's 12/23/2015 cover letter, Ex. 25.3, and as supplemented by the March 25, 2016 Endorsement increasing Carman's agreed hull value to $85,000, Ex. 1.2.9 at P00393.

**Pertinent Policy Provisions**

14.    The Policy provides coverage for property damage to an insured boat from any "accidental cause", subject to Policy exclusions:

> "**We**" will pay for "**property damage**" to the "**insured boat**", its engines and items listed in "What is Covered" from any <u>accidental</u> <u>cause</u> including theft or vandalism.  . . . . All coverages are subject to the limitations and exclusions of the policy.

Ex. 25.3 at 2 of 9 (our underlining).

15. The Policy agrees to cover up to the agreed value "shown on the

Declarations Page or any endorsement," *id.*, which is $85,000, Ex. 1.2.9 at P00393.

16. The Policy contains an exclusion for incomplete, improper and faulty repairs:

> **EXCLUSIONS**
>
> This insurance does not cover: . . .
>
> D.  any loss, damage, expense or cost of repair caused directly or indirectly by incomplete, improper or faulty repair except as provided by the "Repair Guarantee"[4]

Ex. 25. at 3 of 9.

17. The Policy also contains an intentional acts exclusion:

> F.  any loss, damage or expense caused intentionally by, with the knowledge of, or resulting from criminal wrongdoing by any "**insured**".

*Id.*

18. The Policy contains a strict condition of coverage that the insured shall be faithful at all times, which is modified by the Vermont Endorsement to the Yacht Policy:

**Fraud And Concealment** is amended to read:

> If you or your agent has omitted, concealed, misrepresented, sworn falsely, or attempted fraud in reference to any matter relating to this insurance before or after any loss coverage may be denied and the policy cancelled.

*Id.* at VT96 Rev 06/14 3 of 4.

19. Likewise, the Policy allows cancellation in the event of "Material misrepresentation or fraud by you with respect to any material fact affecting this policy or in the submission of any claim under this policy."  *Id.*

---

[4] A "Repair Guarantee" includes repairs performed by an insurer recommended facility in a method approved by the insurer.  Ex. 25.3 at 3 of 9.

20. Cancellation is further permitted in the event "[t]he risk originally accepted has measurably increased." *Id.*

**Carman's Forward Bulkhead Removal**

21. During the summer of 2016 Carman cut out the two forward bulkheads with a RIDGID brand, sawzall-type reciprocating saw, claiming he wanted to store fishing rods in the newly opened forward spaces.  EUO at 14-17; Dep. II at 82-87.

22. According to Woods, Carman's removing the two forward bulkheads diminished the hull's integrity and the boat's buoyancy.  As Marine Surveyor Jonathan K. Klopman also confirmed, it would not have been feasible to store fishing rods by accessing those underdeck spaces through the small hatch forward of the pilot house and contorting the rods 90° to stow them fore and aft, unsecured, where they would jostle, damaging the rods, reels, and monofilament lines, and expose them to bilge moisture.  Exs. 5.4.10 and 5.4.11.

**Carman's Recurring Bilge Pump Problems**

23. During early 2016 the bilge froze affecting bilge pumps, tubes, and hoses, which Carman repaired.  EUO at 28-32.  Afterwards he replaced the port bilge pump. Exs. 5.56, 5.57.

24. Following Carman's complaint of oil in the bilge on September 7, 2016 Point Judith Marina's Bud Smedburg found a continuing electrical problem with the port bilge pump, by-passing its blown fuse to dewater the bilge.  Ex. 1.2.2 at P00320.

25. Carman arrived at Ram Point Marina, where he had a slip, Friday night September 16, 2016 and again found water in the bilge, which he assumed was rain water, and a blown fuse.  Dep. I at 201-02.  He withdrew $2,000 cash at a local Citizen's

Bank, *id.* at 36, and topped off all three diesel fuel tanks, *id.* at 115-17.

26. Carman testified that the next day, September 17, 2016, he replaced the port bilge pump, EUO at 28, again. Although he testified he tested the new pump then, he never confirmed that the aft bilge pump "sucked water" or "pump[ed] water overboard." *Id.* at 35-36. He says he put the old pump in the fish box as a "backup," *id.* at 34, so it was unavailable for inspection after the boat sank.

27. The following day, just prior to the boat's sinking, he admits "that the bilge pumps were not functioning correctly." *Id.* at 113.

**Carman's Half Dollar Holes at the Transom Waterline**

28. For unconvincing reasons Carman also removed his boat's trim tabs on September 17, 2016 while the boat was in the water. In his EUO he testified his reason was he felt the trim tabs increased drag and fuel consumption but he never tested that or consulted any professional or researched it online or otherwise. *Id.* at 55-58; *see also* NH Dep II at 7-8. (lacked knowledge on fuel consumption up to that point for any comparison). So in his first deposition session thirteen months after the EUO he added an entirely new reason – that he removed the trim tabs because a former charter fishing captain said a hooked tuna fish could cut its line on them. Dep. I at 83.

29. Upon removing the four trim tab actuators, Carman testified there were four "half dollar" size thru-hull holes exposed at the transom. EUO at 83, 171. His prior attorney, based on information Carman provided him, reported the half dollar holes by October 12, 2016 letter to the D. Conn. AUSA and CT AG offices. *Id.* at 171; Dep. I at 196.

30. Seated on a Ram Point Marina dock about 6-8 feet away from where Carman

worked on his boat on September 17, 2016, Michael Iozzi spoke with Carman about removing the trim tabs and observed him using a corded, electric ¼" drill with an attached 1½" to 2" diameter hole saw at the transom waterline.

31. Iozzi did not see any holes Carman drilled with the hole saw, just that Carman was using the hole saw on his transom dangerously near the waterline. Carman does not deny using a hole saw on the transom.  He testified he can "[n]ot with absolute confidence" say he did not use a hole saw and has a "vague sense" of using one.  Dep. I at 105-07.

32. Besides the use of a hole saw witnessed by Iozzi and not denied by Carman there is no credible evidence on how the four 1/2" diameter holes Woods originally drilled grew to half dollar size as testified by Carman.

33. For 15 months Carman stuck to his story that the four thru-hull actuator holes at the transom were half dollar size -- even during his first deposition session on January 22, 2017 when he testified there was nothing in the examination under oath transcript that "should be changed to better reflect the truth."  *Id.* at 60-61; NH Dep. II at 112-113.

34. But shortly after lunch during the first deposition, Dep. I at 178-79, regarding "the holes that I opened -- I exposed," *id.* at 191-92, Carman asked to "interject" stating "I think I got half dollars and silver dollars confused in the EUO.  The holes were slightly larger than a quarter," *id.* at 193.

35. The testimony of Carman's purported expert Chris Roth that he drilled only

two 7/8" diameter holes for the "cable" that operates the trim tabs,[5] which he could not

diagram despite attempted coaching,[6] has no credibility since there is no dispute that

there were four holes in the transom for the four actuators' hydraulic lines according to

both Woods and Carman.

36. Because Carman added 300 gallons of diesel fuel after purchasing the boat

with only one full 80 gallon and two empty 150 gallon fuel tanks from Woods, Dep. I at

115-16, (topped off all three fuel tanks September 16, 2016), NH Dep. II at 9-10 (same),

the four half dollar holes would have been approximately 1.3" to 2.8" above the

waterline prior to the last voyage, as calculated by Naval Architect Eric Greene.

37. Not appreciably different, Carman's estimate, which he admits could be

wrong, was that the circular half dollar holes were about 4" above the transom waterline

when he worked on them September 17, 2016.  He also admitted when the boat was

going forward its bow would go up and the holes would go down, closer to the water.

EUO at 83-84.

38. Also, the four half dollar holes were several inches below the two scuppers

which had PVC covers, EUO at 79, on the outboard side of the transom to minimize

seawater from washing onto the cockpit deck, Exs. 12.38; 1.2.4.

**Carman's Incomplete/Improper/Faulty and Unseaworthy Hole Repairs**

39. Carman used less than a whole Epoxy Putty Stick to fill his four half dollar

holes, without solid backing on the inside.  EUO at 177-78.  He "established the transom

was a little bit more than three quarters of an inch thick."  *Id.* at 87.  He did this work

---

[5] Roth Dep. at 18.
[6] *Id.* at 25-28.

while standing on deck, bending over the transom, down to the water, without getting an opportunity to closely inspect his holes.  *Id.* at 136-37.  He admitted that the putty is for surface repairs and that the circular half dollar holes were cylindrical with nothing on the ends.  Dep. I at 191-93, Ex. 5.4.16 (West Marine Epoxy Putty Stick used for "repairs on fiberglass, wood, metal and plastic surfaces").  Greene replicated Carman's repair job and found it woefully inadequate.

40. Even Carman's purported expert Roth opines the right way for Carman to have filled the transom holes would have been to pound tapered wooden plugs into them and then fiberglass over that.[7]

41. At the West Marine store in Narragansett, RI on the day of his trim tab removal, along with purchasing the Epoxy Putty Stick, Carman also purchased a Fiberglass Boat Repair Kit, EUO at 97-100, 123-24; *compare* Dep. I at 125 (contained disposable vinyl gloves, fiberglass mat, additives, containers, detailed instructions) *with* Ex. 5.58 ("Detailed instructions show how to Repair cracks, holes...").

42. Carman did not seal the four half dollar holes he had inadequately filled on the exterior side of the transom by fiberglassing over them using the fiberglass mat fabric and resin he had just purchased.  The Court finds this to be an incomplete, improper, and faulty repair and an unseaworthy condition Carman himself created.

43. As shown by video of the boat underway, Exs. 12.51, 12.52, Carman's four putty-filled holes would have been above the water when the boat was on plane.  But at slower speeds seawater would be lapping at the putty.

---

[7] Roth Dep. at 37-38.

**The Final Voyage: Which Way Did He Go?**

44. On Saturday September 17 Carman had a very full day preparing for an offshore fishing trip.  He made three trips to the Narragansett, RI West Marine store.  Dep. I at 22-23.  He replaced his port bilge pump "late morning to midday," EUO at 121, and drove to the Middletown, RI West Marine store to purchase two harnesses and tethers which he did not disclose to Plaintiffs.  Ex. 5.51 at WM0001.  But only one of the harnesses had inflatable personal floatation -- the other had none.  Id. at WM0010-12 and WM004-6, respectively.   He removed his trim tabs, "[l]ate afternoon, early evening," EUO at 121, not an easy task, and testified about how he filled the transom holes.

45. In Carman's written account of the sinking to BoatU.S., dated October 19, 2016, Ex. 1.2.15 at P00403, he states that he and his mother, Linda Carman, departed Ram Point Marina between 11 pm on Saturday September 17 and 12:30 am on Sunday September 18, 2016 and first fished southwest of Block Island for about an hour.  Their course southwest of Block Island is also supported by his mother's cell phone ping at 12:45 am, which Carman cannot deny, Dep. I at 277, and which was relied on by the USCG to shift its assets for the search and rescue effort, Ex. FOIA.

46. However, during his examination under oath and his deposition Carman detailed the final trip, drawing its course on NOAA Charts 13219 (Point Judith), Ex. 5.4.6; NOAA Chart 13215 (Block Island), Ex. 5.4.29; and NOAA Chart 12300 (Nantucket to Ambrose), Ex. 5.4.34, as transiting only to the east of Block Island.  That version of his story has Carman and his mother first fishing southeast of Block Island at what he calls Striper Rock, marked with an X on NOAA Chart 13215, *see* Ex. 5.4.29, for

around 1 to 1½ hours,  EUO at 150-51; Dep. I at 295-96; Dep. II at 73, 75.  They fished

there with live eels but caught nothing.  EUO at 149, 157.

47. On the way to his so-called Striper Rock -- if that's where they went --

Carman claims there was a change of plans.  EUO at 180, NH Dep. I at 255, NH Dep. II

at 70.  His mother originally understood they would be fishing for striped bass and would

be back by 9 am on Sunday September 18.  As Linda normally did when fishing with

Nathan, she texted that information to her friend, Sharon Hartstein.  Ex. 6.3.42.  But

there was no text sent by Linda with Nathan's new plan to head to the canyons, which

he says she agreed to, and where neither of them had ever gone before.  So off they

went to Block Canyon, "the nearest canyon to go to," despite the fact that Carman

"never heard anyone report catching fish in the Block Canyon area in that time frame

that we were going out."  EUO at 155-56.

48. Carman testified his navigation and piloting abilities are very limited.  Dep. I

at 69 (cannot use a protractor), 268 (unfamiliar with latitude and longitude).  He

removed, *see* Dep. I at 285-86, the mariner's compass Woods mounted directly forward

of the helm in the pilot house, Ex. 5.4.31.  Carman says he did not even use radar as a

position indicator.  Dep. I at 265-66.  Instead, not unlike a video gamer, Carman made

use of a linked GPS/autopilot/chart plotter, *id.* at 253-54, which directed the boat south

over the next "approximately five hours," EUO at 151; NH Dep. II at 95, at 2600 RPM or

15-16 knots, Dep. I at 233, an "additional 80 miles" to Block Canyon, NH Dep. II at 11.

49. Carman's best guess for arriving at his destination is shortly after the sun

came up, or around 7 am on September 18, 2016, which Carman marked with an X on

Chart 12300, *see* Ex. 5.4.34 ; EUO at 152-54, but he testified it could actually have

been further south than depicted by his X, *id.* at 176.

50. After arriving in Block Canyon, he and his mother started trolling northward with artificial lures, Carman testified, at varying 4-6 knots on autopilot in an S-shaped course "up the heart of Block Canyon" and "within the walls of Block Canyon."  EUO at 158, 162; NH Dep. II at 96-99.

51. While trolling Carman said there was a four foot swell, EUO at 158, like a "sine wave," NH Dep. II at 164, from the southeast, per Limeburner buoy data. According to Feeney and Greene, this following sea would result in the half dollar holes' putty failure, with water flooding the bilge forward due to the removed bulkheads and malfunctioning bilge pumps, eventually sinking the boat.

**Carman's Sinking Story Sinks Him – Killing His Mother**

52. After trolling for "[a]pproximately five hours," EUO at 163, sometime around midday, Carman "perceived that the engine sounded different from normal" but he had not previously noticed any boat handling or maneuvering problems, *id.* at 114, or any sort of mechanical failures.  According to his October 19, 2016 written statement to BoatU.S. he looked in the hatch forward of the pilot house and

> observed that a very large amount of water was present in the bilge…  I immediately turned off the engine then asked my mom to bring in the fishing lines while I opened a different hatch in the cockpit deck in order to check to see if any of the thru hull fittings had failed.  Upon opening the hatch, I was not able to see the thru hull fittings because they were underwater with the water level in the space being to just below the level of the deck.

Ex. 5.4.9 at NC0002.

53. He explained that on first opening the hatch forward of the pilot house he saw

water mid-way up the battery boxes, EUO at 108; NH Dep. II at 119, and on second opening the port hatch he saw water within 3 inches of the deck, EUO at 119.  Because the amount of water in the bilge was "extremely unusual," NH Dep. II at 146, he told his mother to reel in the lines, EUO at 115-16, 117, and she said "Yes, I will," *id*. at 165.  At that point she was six feet away, NH Dep. II. at 126, and Carman testified it was the last time he ever spoke with or heard from, EUO at 117-18, 165, or saw his mother again, *id*. at 114; NH Dep. II at 123, 161-62.

54. Carman does not know how the water entered the bilge or why the boat sank. Dep. I at 11-12.  After departing Ram Point Marina he only incidentally looked at the transom exterior while fishing but he never carefully studied the area, Dep. II at 81-82, where he had puttied four holes just 12 hours before.  Even after finding the bilge full of water Carman did not check the exterior transom.

55. Jonathan K. Klopman's expert testimony made clear that the two levels of water in the hatches Carman claims to have observed moments apart while the fore and aft trim had "not perceptibly altered" from even keel, EUO at 114, are disparate, with about a foot more water in the aft port hatch than at the batteries in the hatch forward of the pilot house.

56. Despite all this water aft, Carman claims the boat sank "bow first," very rapidly.  EUO at 114-15.  "One second I was walking forward and the next second I'm in the water."  *Id.* at 165; Ex. 1.2.2 at P00352 (Carman drawing).  Carman's October 19, 2016 written report states "The time that elapsed from when I heard that the engine sounded funny and I observed water in the bilge to when the boat sank and I was in the water was very brief, I am not sure exactly how long it was, but I would estimate three to

five minutes."  Ex. 5.4.9 at NC0002.  Incredibly, however, at no point in Carman's

sinking scenario was there any water on the deck or any water coming through the

scuppers.  NH Dep. II at 159-60.

57. Carman described his mother as very vigilant on the water, always inquiring,

"Is everything okay?" even if Carman just turned around to look aft to "maintain a

situational awareness" while running the boat.  NH Dep. II at 120.  Yet on Carman's

story during this three to five minute period his mother said absolutely nothing while he

opened two deck hatches with flooded and swamped bilges, after he shut down the

diesel engine 100 miles from shore, or while he went into the pilot house three times,

emerging each time with bright yellow emergency gear, NH Dep. II at 87-90 and 6.3.59,

he took to the foredeck.

58. Through all this Carman did not offer his mother a life preserver or tell her

there was a flooding problem.  EUO at 118; Dep. I at 291; NH Dep. II at 87.  Whether he

was being extremely literal as is common with his testimony or whether he just missed

the irony in his telling of this tragedy, Carman testified his mother "was part of the

problem rather than part of the solution."  *Id.* at 128.

59. Equally confounding, Carman did not make any VHF radio calls or attempt to

activate the EPIRB,[8] although both were "[w]ithin a couple feet," EUO at 112, readily

accessible in the pilot house on the three occasions he went inside to retrieve

emergency gear, *id.* at 106-07; NH Dep. II at 138, 148-50, 154; Exs. 5.4.31, 5.4.32,

5.4.33.  His explanation that he had it "deeply engrained" in him not to "signal for

---

[8] Emergency Position Indicating Radio Beacon.  Carman testified it could be "activated manually…you can push a button."  EUO at 102.  Or "you could physically dunk the EPIRB in water to activate it."  *Id.* at 106.

distress unless you are in imminent – your life or limb is in imminent jeopardy," EUO at

107, is belied by his readying emergency gear and contrasts starkly with his 911

emergency cell phone call due to an engine overheat five months before inside the

protected waters of the Point Judith Harbor of Refuge when the Coast Guard towed him

around the corner, Dep. I at 65-75.  In the heat of the moment 100 miles from port with

a flooding bilge in seas so deep his sounding machine could not register bottom,

Carman asks this Court to believe he eschewed the electronic nautical technology on

which his navigation is wholly dependent and chose instead to prepare for survival by

abandoning ship, assembling 30 days of food so that he would not have to "end up like"

the 19th Century "very vivid description of starvation at sea" and "gnawing on the bones

of shipmates" off South America he read about in Philbrick, *In the Heart of the Sea*,

Dep. I at 247-48; Ex. 5.4.42.

60. After Carman's description of the sinking evolution and his assertion that "I

think differently than many people," Dep. I at 247, the Court finds that Carman has an

active imagination and that his testimony regarding his boat's loss is fiction.

**Carman's Seven Day Life Raft Drift Did Not Happen**

61. Carman estimates his boat sank "probably halfway between the X and the

asterisk" he marked on NOAA Chart 12300, *see* Ex. 5.4.34, at about the "140 fathom

mark."  He explained this would have been in the "heart" and "within the walls of Block

Canyon," as he determined by autopilot and GPS.  The depth sounder, though

functioning, "was not showing the depth because it was so deep."  EUO at 161-63.  "I

believe that at the time the boat went beneath the surface, that it was more or less

within the walls of Block Canyon."  In sum, to the best of his knowledge "the sinking

occurred" around the 140 fathom mark.  Dep. I at 297-301.

62. Carman testified there were no other vessels on the horizon, "I wasn't aware of any vessels in proximity to my vessel" when it sank.  EUO at 107-08.

63. Once he made it inside the 4-person life raft and realized his mother would not make it, EUO at 164-66, Ex. 1.2.9 at P00383, P00386; he then "forced himself to take rest."  Ex. 1.2.15 at P00403.   During his seven days he awoke at 8 am every day and had four meals, including "brunch."  NH Dep. II at 167.

64. Besides deploying the life raft's drogue anchor six out of the seven days, Carman did not do anything else to maneuver the speed or direction of the life raft.  Dep. II at 98-99.

65. During his seven days adrift Carman was "uncomfortably cold at periods of time" and constantly needed to use "sponges to soak up the water" and got wet "lying on the floor with water on it."  Id. at 101-02.

66. Carman testified he saw only one very distant vessel's lights one night during his seven days in the life raft, no helicopters, and only high flying commercial aircraft.  NH Dep. II at 75-76, 169.

67. On the seventh day (after the USCG called off its search and rescue efforts, Ex. 18.2) Carman was somehow positioned such that he spotted a ship on the horizon.  It "came right at me" and he asks the Court to believe that as luck would have it the ORIENT LUCKY ended up passing within 30 yards of his life raft.  He yelled at two crewmen to attract their attention.  NH Dep. II at 170-73.

68. Video and photographs from the ORIENT LUCKY show, and Carman confirmed, that he was able to swim to a life ring thrown from the ship.  Dep. II at 89; NH

Dep. II at 175.  Going up the gangway he "managed to walk up the steps under my own power."  Dep. I at 280.  A photo of him going up clearly shows him firmly holding onto the handrails with both hands.  Ex. 1.2.14.  He did not need medical attention aboard. Dep. I at 280-81.

69. The ORIENT LUCKY Captain emailed Carman's retrieval position to the USCG, Ex. 18.2, a position confirmed by the ship's deck log and plots on its Admiralty Chart No. 2860.  Exs. 32.2, 32.3.[9]

70. However, Richard Limeburner, Oceanographer Emeritus, Woods Hole Oceanographic Institution, showed that Carman's life raft could not have drifted from the 140 fathom mark in Block Canyon on September 18 over the next seven days to where he was retrieved about 42 miles southeast by ORIENT LUCKY on September 25, 2016.

71. Using a backward drift analysis similar to the methodology he employed in this case, Limeburner had previously located the 2009 wreck of Air France AF447 in the mid-Atlantic Ocean after taking off from Brazil and the 1898 wreck of the PORTLAND which sank on Stellwagen Bank off Massachusetts.  His work on this case was in many respects in his own backyard, assisted by WHOI and NOAA buoys fortuitously placed roughly midpoint on the course of Carman's alleged drift.

72. Using hourly wind and current data from those buoys, Limeburner was able to project backwards in time from where ORIENT LUCKY retrieved the life raft to the location where the life raft would have begun its drift seven days earlier.  That location would have been 42 miles southeast of the retrieval spot, about 84 miles southeast of Carman's 140 fathom sinking spot in Block Canyon.

---

[9] Admitted in accordance with Fed. R. Evid. 803(6) and 902(12).

73. Limeburner also projected where the life raft would have ended up seven days later if it started drifting on September 18 at the Block Canyon 140 fathom mark. Interestingly, a USCG search and rescue airplane would have flown almost directly overhead the life raft on September 19, which would have ended up 42 miles northwest of Block Canyon on September 25, 2016.

74. Limeburner's calculations were well-grounded on reliable real-time data from on-scene buoys and by the scientific literature.  His postulated east to west current along the New England shelf break (his term for the continental slope and canyons south of New England) was confirmed by independently monitored "drifter" buoys and was also confirmed by F/V PRUDENCE, an offshore lobster boat.  Its Alex Aucoin testified based on his experience as a commercial fisherman that the current in the canyons south of New England flows east to west.

75. Importantly, Aucoin also testified he was fishing in Block Canyon on the very day Carman claims to have sunk there and AIS data confirms PRUDENCE was within a few miles of where Carman says he was trolling.  Aucoin did not see the boat or a life raft that day in Block Canyon.

76. That Carman's story of spending seven days in a life raft is incredible is also supported by the expert opinion of N. Stuart Harris, M.D., Chief, Division of Wilderness Medicine, Massachusetts General Hospital Emergency Department, and Associate Professor, Harvard Medical School.  Reviewing the ORIENT LUCKY photos and video of Carman's rescue, Dr. Harris opined that Carman was not suffering from exposure as would be expected had he been in a life raft for seven days, wet and cold and uncomfortable much of the time.  To the contrary, Dr. Harris opined that Carman would

have displayed severe gross motor skill deficit which is contradicted by his fine motor skills as exemplified by his firm hold on the handrails going up the gangway.

77. ORIENT LUCKY brought Carman to Boston, its next port of call.  He was met there by Attorney Trent LaLima whose office represented Carman related to his grandfather's murder and Carman was surprised he was there.  Dep. I at 269.  Carman was interviewed by the USCG and law enforcement but those interview records are not in evidence here.

78. Afterward, Carman sent a handwritten thank you note with religious ruminations to the ORIENT LUCKY Captain.  Ex. 5.52.  In it Carman acknowledges that "If my Mom is lost, which I fear is likely, I will have no one on earth who will welcome me sincerely into their home."

**Despite All This, Carman Pursues an $85,000 Insurance Claim**

79.  On October 7, 2016 Carman telephoned BoatU.S. to make an $85,000 insurance claim for the sinking loss of his boat.  During that initial telephone conversation the claims adjuster, Martha Charlesworth, recorded Carman as saying "the boat sank very far off shore and would not likely be recovered."  Ex. 17.2 at P00159.

80. Charlesworth promptly assigned a marine surveyor to assess whether Point Judith Marine's engine installation was sound and whether the boat was seaworthy when it departed on the final trip.  She had also appointed undersigned counsel of record to conduct an investigation and address whether Carman's sinking was covered under the policy.  *Id.* at P00159 - 60.

81. Charlesworth emailed Carman a letter dated October 12, 2016, advising that "until more information is known, we cannot confirm whether this loss is covered under

your policy." The letter also stated:

> To assist us with our investigation, please provide us with your detailed written account of the loss along with a copy of any repair estimate or invoices. Also provide any other documents (photos, drawings, a written statement of how the damages occurred) that you think will help us to fully understand your claim and the extent of damages incurred.

Ex. 17.3.

82. Carman responded on October 19 by email attaching a one page statement describing the final voyage and the sinking. His email also attached Point Judith Marine records related to its replacement of a rebuilt Cummings engine after the April overheating. Ex. 1.2.15 at P00403.

83. But Carman's written statement did not mention anything about his removing the forward bulkheads, his recurring bilge pump and blown fuse problems, or his removing the trim tabs and puttying the four half dollar holes the day before the sinking. And neither did Carman attach any West Marine invoices for the repairs he conducted the day before the sinking on the port bilge pump and four transom holes.

84. Carman telephoned Charlesworth on October 28, 2016 inquiring about the status of the claim. After the surveyor reported on October 31 that he could find no proof the boat was unseaworthy when it left port, Charlesworth conferred with her supervisor and then telephoned Carman that she would start the process of paying the claim, which would require him to fill out paper work and transfer the boat's title to BoatU.S. Ex. 17.2 at P00161. Carman confirms Charlesworth asked him to sign title "over to BoatUS." Dep. I at 198. She told Carman she would send him the necessary paperwork the next day. Ex. 17.2 at P00161.

85. Late in the day on October 31, after her telephone call with Carman, Charlesworth received an attorney-client privileged email from undersigned counsel of record providing her with more information than Carman had in his October 19, 2016 statement.  The next morning Charlesworth emailed Carman saying "I neglected the fact that my supervisor has to review and approve the documents prior to me sending them to you.  The documents are with him for review.  Once I have more information I will let you know."  Ex. 17.5.

86. During a November 4, 2016 telephone conversation, Charlesworth, Ex. 17.2 at P00161, and Carman both understood he would not sign over title to BoatU.S. "unless I'm assured that I'm going to be paid," Dep. I at 198-99.

87. By November 11, 2016 letter Charlesworth requested that Carman provide an examination under oath, Ex. 17.6, which was re-scheduled once and took place on December 16, 2016.

88. On January 27, 2017 Charlesworth issued a letter to Carman denying his sinking claim, ECF No. 1-1, and later that day Plaintiffs filed this suit for declaratory judgment.

89. Carman filed an amended answer and counterclaim on May 10, 2017, ECF No. 12, to which Plaintiffs replied with an amended answer on June 7, 2017, adding a third amended affirmative defense ¶ 88 for Fraud and Concealment on January 31, 2019, ECF No. 122, alleging after fact discovery that there was a close connection and striking, chilling parallels between the loss of Carman's mother at sea and his grandfather's murder in 2013.

**A Look Back at His Grandfather's Murder**

90. Carman obtained his New Hampshire driver's license on November 5, 2013 and registered his truck in New Hampshire on November 6, 2013 using the address of his grandfather's West Chesterfield, NH estate.  Ex. 6.3.28.

91. With that identification, and $2,099.99 cash, Carman purchased a Sig Sauer 716 Patrol Rifle also described as Sig Sauer 716 Patrol 308 Quadrail, Magpul Furniture, Serial No. 22C012970, from Shooters Outpost in Hookset, NH on November 11, 2013, while his grandmother was in hospice.  Jed Warner, the salesman, testified about the purchase and sale documents reflecting the sale, Ex. 5.4.47, and he remembered Carman as being knowledgeable about the firearm's ability to shoot basically identical .308 Winchester and 7.62 NATO caliber ammunition interchangeably.

92. Carman had dinner with his grandfather on the evening of December 19, 2019 in Connecticut and was the last known person to see him alive, at around 8:30 pm in his Windsor, CT home.  Later that evening or early the next morning, the grandfather was murdered in his bed, shot in the head with .30 caliber class ammunition.  ECF No. 86-1; Ex. 29.1.

93. Carman was scheduled to meet his mother Linda Carman at 3:00 a.m. on December 20, 2013, Ex. 6.3.3 at 12, to go fishing on a Frances Fleet charter boat out of Point Judith, Dep. II at 55-56, 58, which he had made a reservation for "a couple days" days prior, NH Dep. I at 193.  Carman never appeared and after calling his cell phone "four of five times," NH Dep. I at 202 (Carman "do[esn't] refute" this), his mother returned home to Middletown, CT, Ex. 6.3.3 at 12.  Carman re-surfaced after 4:00 a.m., finally turning on his cell phone to call his mother, Ex. 6.3.6 at 35, after being

unaccounted for, for over an hour.  His mother agreed to meet him at a different

location, NH Dep. I at 197, which they did, and they both went on the fishing trip that

lasted most of the day.  Dep. II at 55-56, 58.

94. Carman lied at least twice on Windsor Police Department questions about his

firearm ownership, not revealing that he had recently purchased the Sig Sauer:

a. On December 20, 2013 after the Frances Fleet fishing trip a detective asked

Carman:

> DETECTIVE DeJESUS: … Do you own any firearms?
>
> MR. CARMAN:  I do have an air gun.  I'm not sure if that
> counts as a firearm, but –
>
> DETECTIVE DeJESUS: … Is that the only –
>
> MR. CARMAN:  Yes it is.

NH Dep. I at 157-58, Ex. 6.3.3 at 53:11-15.

b. On January 14, 2017 another detective asked, besides the air gun and a

shotgun Carman purchased after his grandfather's murder:

> DETECTIVE MacGREGOR:  Any other purchases of a
> firearm at any time?
>
> MR. CARMAN:  No.

NH Dep. I at 160-64; Ex. 6.3.6 at 93:9-11.

95. When asked in his July 17, 2018 deposition, "Did you ever own a Sig Sauer

716 Patrol Rifle?" Carman answered, "I invoke my Fifth Amendment privilege…."  Dep.

II at 110; *see also* at 15 (took 5th "Did you ever purchase a Sig Sauer rifle from a gun

store in New Hampshire?"); at 17 (took 5th "Did you buy a Sig Sauer anywhere prior to

your Grandfather's death?"); at 38 (took 5th "Did you ever buy a Sig Sauer rifle of any

caliber?"); at 43 (took 5th "Did you ever buy a Sig Sauer 716 Patrol rifle?"); at 54 (took

5th Did you ever buy "a Sig Sauer 716 Patrol rifle with a 7.62 caliber bore"?).

96. But in that deposition, when asked "Did you buy a .308 caliber firearm from

anywhere prior to your grandfather's death?" Carman answered "No," *id.* at 17, *see also*

10 ("I've never owned a Sig Sauer 716 .308 Caliber gun"), 34, 36 (never owned a "Sig

Sauer .308 firearm").

97. Carman admits destroying his truck's GPS and his laptop's hard drive after

the murder but asserted the 5th Amendment on why.  Dep. II at 29-33.

98. Following his grandfather's death, Carman testified he received unrestricted

access to $560,000, comprised of inheritance from the grandfather, a related gift from

Carman's mother, and cash from a college savings plan, *id.* at 21-23, all of which was

due to changes his grandfather made to two accounts with Carman's knowledge eight

months prior to his death.

99. Ballistics testing of the Sig Sauer would enable a conclusive determination

whether it was the weapon used to murder Carman's grandfather, ECF No. 86-1 ("If any

.30 caliber class firearms are developed in this case they should be submitted to the

laboratory…."), as amplified by the expert ballistics testimony of Richard N. Ernest.  The

.30 caliber class of ammunition includes both Winchester .308 and NATO 7.62 calibers.

100. Accordingly, Plaintiffs demanded that Carman produce the Sig Sauer at his

third deposition, held in his home state of Vermont on October 30, 2018, but his counsel

responded in writing that Carman does not have the firearm in his "possession, custody,

and/or control."  Dep. III at 12-15; Ex. 5.4.45 ¶ 5.  When Carman was asked on the

record in the deposition whether he had possession, custody, or control of it, he

asserted the 5th Amendment.  Dep. III at 19-20.

101. In reference to Ex. 5.4.47, the Shooters Outpost Invoice, Carman also

asserted the 5th Amendment on the following deposition questions:

> Q.  Where is this item listed, Sig Sauer 716 Patrol .308 Quad Rail Magpul Furniture with a serial number of 22C012970 now?
>
> A.  In response to that question, I'm going to invoke the Fifth Amendment and decline to answer on that basis.
>
> Q.  Is it at the bottom of the sea?
>
> A.  In response to that question, I'm going to invoke the Fifth Amendment and decline to answer on that basis.
>
> Q.  Was it jettisoned when you went fishing with the Frances Fleet on December 20th, 2013?
>
> A.  In response to that question –
>
> MR. ANDERSON:  Wait.  Wait….[soliloquy]…I'll have Mr. Carman invoke the Fifth.
>
> A.  In response to your last question, I invoke the Fifth Amendment privilege and decline to answer.

Dep. III at 55-56.  Carman purports to change that last answer by errata sheet.

102.  The similarities between the deaths of Carman's grandfather and mother

can be summarized in the below table:

| Grandfather's Murder | Mother's Death at Sea |
|---|---|
| Bought Sig Sauer, Serial # 22C012790, November 11, 2013 in NH | Bought boat December 2015; first registered in NH |
| Last known person to see him alive, December 19, 2013 | Last person to see her alive, September 18, 2016 |
| Grandfather murdered with .30 class ammo December 19/20, 2013 | Mother dies on boat September 18, 2016 |

| | |
|---|---|
| Unaccounted inconsistencies in Carman's truck route/timing, 12/20/2013 am | Unaccounted inconsistencies in Carman's course/timing, 9/18/16 am |
| Laptop hard drive and truck GPS destroyed | Boat's navigational electronics sunk |
| Fishing with mother immediately after murder | Fishing as mother goes silent, 7 days in life raft |
| Lies, 5th Amendment assertions, Sig now "at bottom of the sea" per adverse inference, not produced at deposition | Lies about Block Canyon, boat never will be found |
| $560,000 unrestricted funds | $85,000 hull insurance claim |

**The Common Motive**

103. A unifying theme in the deaths of Carman's grandfather and mother is his attempt to accelerate his inheritance of a ¼ share in the multi-million dollar Chakalos Family Dynasty Trust.

104. John Chakalos' financial advisor, William Rabbitt, testified that Carman frequently attended meetings between Rabbitt and Chakalos and actively questioned what amounts he would receive.

105. Attorney Caroline Calio, who drafted the Chakalos Family Dynasty Trust documents, also testified that Carman frequently attended meetings between Calio and Chakalos and actively questioned what amounts he would receive under various eventualities.  She testified about a series of written questions presented her by eighteen year old Carman in 2012, several of which sought information on "the organizational structure of the trust(s), what the trust(s) mean(s) to me now, and how that meaning will change or when certain scenarios present themselves in the future," Ex. 28.2., with specific questions about how much he would receive on the death of his grandfather and then the death of his mother, *see id.*

106. Carman was a problem child growing up.  He ran away to Virginia after his horse died.  He was not allowed to attend his senior year at Middletown, CT High School.  And he took advantage of his grandfather who provided him with college tuition, NH Dep. I at 80, an apartment, *id.* at 70, cell phone, utilities, pick-up truck, credit card, and cash, *id.* at 115.  For example, Carman himself admits he swore at his grandfather when, shortly before delivery, he "withdrew his promise" to buy Carman a $50,000 Ford F-150 Platinum pickup truck and got him a used Nissan Titan pickup instead.  Ex. 7 at 5.

107. Proclaiming himself a genius based on his IQ score, NH Dep. I at 26, Carman flunked all four courses he took during the fall 2013 semester at Northwestern Connecticut Community College -- Accounting, Management, Macroeconomics, and Composition, Ex. 6.3.15.

108. Notwithstanding his academic failings, Carman claims that as his grandfather's unpaid "interlocutor" he had great opportunities for "personal and professional growth."  Ex. 7.1 at 13, 9.  Yet after his grandfather's murder Carman's only jobs were washing dishes at a boarding school and handling packages at Federal Express, which lasted just a few months.  *Id.* at 12-13.  He withdrew from the labor market, he says, so he could personally fix up the house he had purchased in Vernon, VT with the inheritance from his grandfather.

109. With the inheritance from his grandfather Carman also bought the boat from Woods.  Dep. II at 21.

110. Carman has not attended school since his four Fs at the end of 2013 and has had no gainful employment since his Fed Ex job ended November/December 2014.

He has been "[l]iving off the money that was left to me by my grandfather, as well as money that was gifted to me by my mom."  NH Dep. I at 29-30.

## PROPOSED CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this dispute involving a contract of marine insurance on a vessel under the Admiralty and Maritime Jurisdiction of the United States District Courts, 28 U.S.C. § 1333, and under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.  "Suits on maritime insurance policies are classic examples of matters within federal maritime jurisdiction."  *Central Int'l Co. v. Kempter Nat'l Ins. Cos.,* 202 F.3d 372, 373 (1st Cir. 2000); *see also Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 602 (1st Cir. 1997) ("the protection afforded by the yacht policy is tied closely to the pleasure boat and matters arising out of its ownership, operation, and maintenance in specified waters.  On that basis, the yacht policy constitutes an ocean marine policy within the federal courts' admiralty jurisdiction."); *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995) ("The propriety of maritime jurisdiction over a suit involving a maritime insurance policy is unquestionable.").

2. In *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14 (2004), the Supreme Court held that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contact interpretation."  *Id.* at 23.  It elaborates that "when state interests cannot be accommodated without defeating a federal interest, as is the case here, then federal substantive law should govern."  *Id.* at 27.  Accordingly, and as is the case in marine insurance contracts, federal maritime law applies to the preemption of state law.  *Lloyd's of London v. Pagan-Sanchez,* 539 F.3d 19, 24-25 (1st Cir. 2008).  If there is an absence of a federal maritime rule on point, however, the appropriate state law will

apply to the interpretation of the marine insurance contract.  *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310 (1955).

3. In the absence of a federal maritime rule on point, there is a question as to which state's law to apply:  Rhode Island, where the boat was berthed, or Vermont, where Carman resided and where the Policy was issued?  *See In re Litigation Involving Alleged Loss of Cargo from Tug Atlantic Seahorse, etc.,* 772 F. Supp. 707, 709-10 (D.P.R. 1992) (citing *State Trading Corp. v. Assuranceforeningen Skuld,* 921 F.2d 409 (2d Cir. 1990)).

4. When faced with this question, Federal Courts have applied the federal choice of law rules as articulated in the *Restatement (Second) of Conflict of Laws.  See F/V Misty Dawn v. Osprey Underwriting,* 2010 U.S. Dist. LEXIS 99068, *6-10 (D. Mass. 2010).

5. Applying the *Restatement* and federal choice of law rules in the context of an insurance contract, "[t]he basic policy underlying contract choice of law is to protect the expectations of the parties."  *F/V Misty Dawn,* 2010 U.S. Dist. LEXIS 99068 at *7-8.  In the absence of a choice of law clause, and applying the above factors, federal courts look to the multitude of contacts to determine the "center of gravity" of the policies' formation.  *See Albany Ins. Co. v. Wisniewski,* 579 F. Supp. 1004, 1013 (D.R.I. 1984) (citing *Navegacion Goya, S.A. v. Mutual Boiler & Machinery Insurance Co.,* 1972 AMC 650, 653-54 (S.D.N.Y. 1972)).

6. Here, the Policy was issued to Carman at his residence in Vermont and while the Policy does not have an express choice of law clause, it conspicuously includes a Vermont Endorsement.  The fact that Carman's boat was berthed in Rhode Island is a

comparatively tangential factor in the choice of law analysis, as there is an expressed intent for the law of the place of policy issuance (Vermont) to apply. *See Albany Ins. Co.,* 579 F. Supp. at 1013-14 (applying New York law despite vessel's location in Rhode Island). Accordingly, in the absence of any federal maritime rule on point, Vermont's laws as to policy interpretation should apply.

7. Venue is proper in the District of Rhode Island in accordance with 28 U.S.C. § 1391(b)(2) because the insured boat at issue was home ported in Rhode Island and a substantial part of Defendant's acts or omissions giving rise to this suit occurred here.

**The Policy's Language Applies**

8. To commence coverage, insurance companies, as here, generally issue a "binder," or "preliminary insurance contract, that covers the applicant until the insurance company either issues a policy or refuses the risk." *In re Waste Systems, Intern., Inc.,* 317 B.R. 650, 655 (D. Del. 2004) (*citing* Lee R. Russ & Thomas F. Segalla, 1 *Couch on Insurance 3d* § 13.1; *Hartford Nat. Bank and Trust Co. v. United Truck Leasing Corp.,* 24 Mass.App.Ct. 626, 630, 511 N.E.2d 637, 640 (Mass.App.Ct. 1987).

9. "A binder is not an insurance policy, but it is considered a contract providing interim insurance from the date of the application until either completion or rejection of the principal policy." *In re Waste Systems,* 317 B.R. at 655 (citing 1 *Couch*, *supra* at § 13.2).

10. "Generally a contract of temporary insurance -- the binder -- is terminated by the issuance of a policy, or by a rejection of the application. If no policy is issued, and the binder is not otherwise terminated, it continues until the time fixed for its termination or a reasonable time has expired." *In re Waste Systems,* 317 B.R. at 656 (citing 1

Couch, *supra* at § 13.9).

11. "It is '[h]ornbook insurance law that a binder merges into the subsequently issued policy so that the terms and conditions of the policy, in the case of conflict or ambiguity, are controlling.'"  *King v. Allstate Ins. Co.,* 906 F.2d 1537, 1541 (11th Cir. 1990) (quoting *Brister v. Gulf Cent. Pipeline Co.,* 618 F.Supp. 104, 110 (W.D. La. 1985), *aff'd* 788 F.2d 1564 (5th Cir. 1986); *see also Kellner v. Aetna Cas. & Sur. Co.,* 605 F. Supp. 331, 333 (M.D. Pa. 1984) (binder is a "complete, temporary or preliminary contract" effective from the time it is issued until "issuance of the formal policy or until rejection of the risk").

12. Further, if an insurance binder and other insurance documents preliminary to the issuance of the formal policy incorporate policy terms by reference, then such policy terms must apply to the interpretation of the insurance binder.  *King,* 906 F.2d at 1541-42.

13. Likewise, an insurance binder binds the insurer according to its terms, and "to the extent that they are not set forth, the insurer is bound by the terms and conditions of the policy ordinarily issued by it to insure like risks."  1A *Couch on Insurance*, § 13:6 (3d Ed. 2019); *see also Acadia Ins. Co. v. Allied Marine Transport, LLC,* 151 F.Supp.2d 107, 125 (D. Me. 2001) (insurance binder incorporates insurer's policy terms typically issued for such risks at the time).

14. As a general rule, a policy is considered issued and delivered when executed by the insurance company and mailed to the insured.  1A *Couch on Insurance*, § 14:15 (3d ed. June 2019) (citing *Curry v. Reserve Life Ins. Co.,* 43 So. 2d 312 (La. Ct. App.2d Cir. 1949); *National Aid Life Ass'n v. Gregory,*  63 P.2d 947 (Okla. 1936); *Landry v. J.C.*

*Penney Life Ins. Co.,* 920 F. Supp. 99 (W.D. La. 1995)).

15. An insured is deemed to have accepted a policy if he does not tender his rejection thereof within a reasonable time after mailing.  1A *Couch on Insurance*, § 16:4 (3d ed. 2019) (citing *Goldstone v. Columbia Life & Trust Co.,* 33 Cal. App. 119, 164 P.416 (3d Dist. 1917)).

16. Here, Carman seeks to avoid the Marine Insurance Binder and Policy mailed December 23, 2015.  In doing so, Carman states that he does not monitor his mail and claims not to have received the Policy.  The Court rejects his argument.  The Marine Insurance Binder Carman received, which he attached as part of his counterclaim, and which he accepted by returning his 2/19/2016 signed Marine Insurance Application, conspicuously states that it is subject to the terms of the "policy(ies) in current use by [NLFIC]" which are incorporated by reference.  Carman's testimony acknowledges as much.  FF 12c; Dep. I at 149-50.  The Policy was then mailed, merging the Marine Insurance Binder into the Policy.  Even if delivery of the Policy never occurred, NLFIC's standard policy terms are incorporated into the Marine Insurance Binder, which are identical to the Policy at issue.  This policy language was available for Carman to obtain from BoatU.S. before the sinking and was also on file with the Vermont Division of Insurance.  The concept that Carman did not know about or did not accept his Policy terms, moreover, is not believable in light of his successful prior claim for engine damage and related correspondence to him from BoatU.S. which is overwhelmingly consistent with Carman's acceptance and knowledge of written Policy terms.

**Carman Did Not Sustain His Burden of Proof**

17.  An insured bears the burden of establishing a *prima facie* case for recovery

under an all-risk insurance policy. *Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc.*, 167 F.3d 1, 7 (1st Cir. 1999); *Eveden Inc. v. N. Assur. Co. of Am.*, 2014 U.S. Dist. LEXIS 31999, *8 (D. Mass. 2014); *Markel American Ins. Co. v. Pajam Fishing Corp.*, 691 F.Supp.2d 260, 264 (D. Mass. 2010); *see also National Liability & Fire Ins. Co. v. Jablonowski*, 2018 AMC 2857, 2862-63 (D. Conn. 2018):

> An insurer's status as plaintiff in a declaratory judgment action does not shift the burden of proof away from the insured. *See Preferred Acc. Ins. Co. of N.Y. v. Grasso*, 186 F.2d 987, 991 (2d Cir. 1951); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 198-203 (2014) (holding that the operation of the Declaratory Judgment Act does not change underlying substantive aspects of a claim, including the burden of proof).

18. In Count III Plaintiffs rely on Coverage A's premise that only losses "from any accidental cause" are covered.  Under maritime law:

> "Accidental" is synonymous with "fortuitous."  *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1202 (1st Cir. 1994) ("The courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.") (internal quotations and citations omitted).

*Markel American Ins. Co.*, 691 F.Supp.2d at 265.  "While [all-risk policies] are not 'all loss' policies and contain express and implied exclusions, 'recovery under an all-risk policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud, or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage.'"  *Id.*

19. Similarly, under Vermont law, as it is in almost all jurisdictions, "all risk" policies are not "all loss" policies, and a loss can only be covered if it is *fortuitous.  City*

of *Burlington v. Indem. Ins. Co. of N. America,* 332 F.3d 38, 47 (2d Cir. 2003) (applying Vermont law).  Inevitable losses, expected losses, and losses obtained by intentional misconduct or fraud by the insured are not considered "fortuitous" and are therefore not covered under an all-risk policy.  *Id.*  A "fortuitous" event is one "'occurring by chance without evident causal need or relation or without deliberate intention.'"  *Id.*  This is true as a matter of contract interpretation, but also as a matter of public policy because insurance contracts cannot and should not cover certainties not subject to chance. Indeed, policies covering only "accidents," such as here, are limited to covering only "fortuities."

20.  For the reasons stated below, the Court concludes that Carman cannot sustain his burden of showing the sinking was fortuitous.

**Complaint, Counts I and II**
*Carman materially increased his insurers' risk*

21. Carman's alterations to his boat, omitted and concealed from Plaintiff insurers, measurably and materially increased their risk, supporting Plaintiffs' cancelling, voiding, and denying coverage under the Policy.

22. Counts I and II are grounded on the maritime law principle of *uberrimae fidei* which "is an established rule of maritime law," *Lloyd's v. San Juan Towing & Marine Servs.*, 778 F.3d 69, 80 (1st Cir. 2015), applicable to the Policy, whatever its terms. "Under *uberrimae fidei*, when the marine insured fails to disclose to the marine insurer all circumstances known to it and unknown to the insurer which 'materially affect the insurer's risk,' the insurer may void the marine insurance policy at its option."  *Id.* at 83 *citing Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 55 (1st Cir. 1995):

"Once policy coverage has commenced, the doctrine imposes an equally strict, continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, knowingly be permitted to break ground in an unseaworthy condition."  *Id.* at at 55; *McLanahan v. Universal Ins. Co.*, 26 U.S. 170 (1828):

> where a party orders insurance, and afterwards receives intelligence material to the risk,…he ought to communicate it to the agent, as soon as, with due and reasonable diligence, it can be communicated, for the purpose of…laying the circumstances before the underwriter.  If he omits so to do, and by due and reasonable diligence the information might have been communicated, so as to have countermanded the insurance, the policy is void.

*Id.* at 185.

23. A party's intent to conceal, or lack thereof, is irrelevant to the *uberrimae fidei* analysis.  *See Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984) (a material misrepresentation, even if it is a result of a "mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void") (internal quotation marks omitted).  The only thing that matters is the existence of a material misrepresentation.  *AGF Marine Aviation & Transport v. Cassin*, 544 F.3d 255 (3rd Cir. 2008).  "The duty to disclose material facts applies even where no inquiry has been made."  *St. Paul Fire and Marine Ins.,* 495 F.Supp.2d at 237, 2007 AMC at 2183.

24. *Giragosian* stated "a small amount of water" or "engine trouble" is not enough in "these times" to require a pleasure boat owner to notify the insurer.  There the vessel "was indeed unseaworthy when Giragosian set sail, but he did not know of its unseaworthy condition, and the condition was not the result of his neglect or lack of due

diligence." *Giragosian*, 57 F.3d at 55.  But what Carman did to his boat is extreme:

> Carman admits he used a sawzall to remove two structural bulkheads;
>
> He had recurring bilge pump and fuse problems; and
>
> He removed the trim tabs and enlarged (or indisputedly exposed) four half dollar size holes near the transom waterline, which even his purported expert says he incompletely repaired.

25. Somehow the four ½" diameter holes Woods drilled when he installed the trim tab actuators grew to Carman's half dollar holes when he removed the actuators the day before the sinking.  The only explanation is Carman's hole saw.  However the half dollar holes got there, Carman's belated deposition attempt to reduce them to the size of quarters after lunch with his counsel shows they know that four half dollar transom holes made the boat unseaworthy and materially increased the Plaintiff insurers' risk.  The subsequent failed attempt to coach Defendant's purported expert Roth into drilling the right number of properly placed holes the size of quarters is another example of the interference with evidence throughout this case that sinks Defendant.

26. Under the *uberrimae fidei* doctrine, "[t]o be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk."  The test for disclosure is objective: "whether a reasonable person in the assured's position would know that the particular fact is material."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986).  A recreational boater does not need to be a self-proclaimed genius like Carman to know holes in boats makes them sink.  Carman needed to disclose them.

27. The next "particular fact" is material -- as in the proper material to repair the holes.  Armed with two different materials to fix four half dollar waterline holes in a fiberglass hull, what would the reasonable recreational boater use, putty or fiberglass? Contrary to clear product labeling and directions, Carman opted for putty intended for "repairs on fiberglass, wood, metal, and plastic surfaces," FF 39, instead of using the fiberglass kit to seal "holes" in the fiberglass hull, FF 41, as Roth would, FF 40.  Carman needed to disclose this alteration in materials too.  The most telling evidence of materiality is Carman's own pre-purchase/insurance surveyor, who testified that were the boat's transom holes puttied as described by Carman, then he would not even OK its launching.

28. In addition, Carman had sawed out his bulkheads and had malfunctioning bilge pumps.  He did not notify and in fact concealed from Plaintiffs any of these "circumstances known to [him] and unknown to the insurer," *San Juan Towing,* 778 F.3d at 83*,* and in that self-inflicted unseaworthy condition Carman took the boat on its final voyage, testifying that it sank 12 hours later, 80 miles further offshore than he had ever gone in the boat.

29. Furthermore, Carman's sole expert does not address key *uberrimae fidei* issues of fact such that there is no defense expert witness to rebut a finding that Carman's alterations did "'materially affect the insurer's risk'" under *San Juan Towing,* 778 F.3d at 83:

a. Bernard Feeney, the marine surveyor Carman hired for his pre-purchase/insurance survey, and retained as an expert by Plaintiffs, opined that Carman's bulkhead removals, bilge pump problems, and inadequately filled trim tab

holes altered the boat by making it unseaworthy and had those problems been present when Feeney surveyed the boat he would have required their repair before the next launch.

b. Had such a pre-purchase Feeney survey been presented with Carman's insurance application, it would not have been accepted according to Pellerin, BoatU.S. Vice President for Underwriting, because the problems pointed out by Feeney would have materially affected and/or measurably increased the risk or alternatively Carman's boat would have been placed on limited Port Risk Ashore.

30. Accordingly, under Count I the Vermont Endorsement in the insurance policy excludes coverage here:

> **Cancellation**
>
> We may cancel for one or more of the following reasons:…
>
>> 4. The risk originally accepted has measurably increased;…
>
> **Fraud And Concealment**…
>
> If you…omitted, concealed…in reference to any matter relating to any matter relating to this insurance before or after any loss coverage may be denied and the policy cancelled.[10]

---

[10] If Defendant claims the Vermont Endorsement is not part of Yacht Policy No. 3985989-15 because a copy of it was not attached in the email BoatU.S. sent him on November 29, 2016 (despite the fact that it is referenced on the DECLARATIONS PAGE sent with the same email), the language of the Yacht Policy booklet (sent with the same email) on pages 10-11 regarding Cancellation and Fraud and Concealment is not dissimilar.  If Defendant alternatively argues Yacht Policy No. 3985989-15 based on either Cancellation clause can only be cancelled prospectively with advance notice, the notice requirement would only apply when the policy is current but here it had expired on December 23, 2016, more than a month before the BoatU.S. January 27, 2017 denial letter was sent to Carman.  In any event, that letter voided and denied coverage, as allowed by the *uberrimae fidei* principle of maritime law and as specifically allowed by the policy's Fraud and Concealment clauses, respectively, and neither of those grounds need be communicated prospectively.

31. Carman, however, disputes that the Vermont Endorsement or any policy language whatsoever is enforceable, despite FF 12 a-j.  If that is really his position at trial, and assuming *arguendo* Defendant is correct (he is not), Plaintiffs still have the alternate argument to prevail on Count II that Carman breached the strict *uberrimae fidei* doctrine applicable to any marine insurance policy regardless of its terms.

32. In sum, there is no coverage on account of Carman's concealment under Counts I and II.

**Complaint, Counts IV and VI**
*Carman's faulty, unseaworthy repair*

33. Similarly, whether based on the Policy's Exclusion D language that there is no coverage for "any loss, damage, expense or cost of repair caused directly or indirectly by incomplete, improper, or faulty repair" (Count IV) or based on the maritime law principle that an insured cannot breach the negative implied warranty of seaworthiness (Count VI), there is no insurance coverage for Carman's sinking claim.

34. "All risk" policies such as Carman's cover the "fortuitous loss" of the insured vessel "unless such a loss is expressly excluded."  *Markel American Ins. Co.*, 691 F.Supp.2d at 266, *citing In re Balfour MacLaine Int'l*, 85 F.3d 68, 77 (2d Cir. 1996). Count IV's Exclusion D is one of six enumerated, disjunctive EXCLUSIONS in the Yacht Policy.

35. There is in addition a negative warranty and covenant implied in every marine insurance contract that the insured will not knowingly commence a voyage when the insured vessel is unseaworthy.  *Certain Underwriters at Lloyd's v. Johnston,* 124 F.Supp.2d 763, 772 (D.P.R. 1999) (quoting *Employers Ins. Of Wausau v. Occidental*

*Petroleum,* 978 F.2d 1422, 1431 (5ᵗʰ Cir. 1992) (citing *Saskatchewan Govt. Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385 (5ᵗʰ Cir. 1957); *Ins. Co. of North America v. Board of Comm'rs of the Port of New Orleans,* 733 F.2d 1161, 1985 AMC 1460 (5ᵗʰ Cir. 1984)). Under Count VI Plaintiffs need to show that (a) an unseaworthy condition existed at the commencement of the voyage; (b) Carman had knowledge of the unseaworthy condition but allowed the boat to depart anyway; and (c) the unseaworthy condition was the proximate cause of the sinking.  *See, e.g., Saskatchewan Govt. Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385, 388 (5th Cir. 1957); *Federal Ins. Co. v. PPG Realty*, 538 F.Supp.2d 680, 696 (S.D.N.Y. 2008), *aff'd* 340 Fed. Appx. 5 (2d Cir. 2009).

36. Even Roth testified Carman's transom holes repair was incomplete for not using fiberglass as an exterior seal and there is no defense expert to rebut:

a. Feeney's opinion that on Carman's story that his boat sank the next day, it was due to water intrusion into inadequately sealed holes below the scuppers with exterior covers.  That water accumulated inside the hull due to failed bilge pumps and flowed forward into what had been air pockets, resulting in an entirely predictable sinking.

b. Klopman, another expert marine surveyor retained by Plaintiffs, testified that had he been asked to inspect the boat subsequent to Carman's puttying the holes he would have reported to the underwriter that the insured had performed an amateurish and inadequate repair.  Given the potential for failure combined with the intended use for offshore fishing, Klopman would have recommended that the underwriter place the boat on Port Risk Ashore so that the holes could be plugged, feathered, and properly patched with fiberglass.

c. Klopman also opined there was no sound or practical reason for Carman to cut

away the bulkheads for under deck storage.  The only foreseeable reason to cut away the bulkheads would be to breach their floatation integrity.

d. Plaintiffs' expert naval architect Eric Greene further opined that Carman's attempting a repair with improper materials and limited access to the repair area on holes that penetrated the transom so close to the waterline created a situation where the boat would be considered unseaworthy, especially trolling for five hours at slow speed with a following sea.  The likelihood of the bilge gradually filling with water entering the holes would be quite high.

37. Based on Feeney's, Klopman's, and Greene's above opinions, which are not rebutted by any Carman expert, BoatU.S. Claims Adjustor Martha Charlesworth was justified in denying Carman's insurance claim under Counts I, II, IV, and VI due to the serious deficiencies he inflicted on his boat (*e.g.*, his bulkhead removal, opening/ enlarging/inadequately sealing four trim tab holes near the transom waterline and below scuppers with outboard covers, with recurring bilge pump problems) prior to its final voyage.

**Complaint, Counts III and V**
*Not accidental but intentional*

38. Although it is clear that Carman materially increased the Plaintiffs' risk by altering his boat after Feeney's survey, improperly repaired the transom holes, and left Ram Point Marina in a known, unseaworthy condition that caused the Block Canyon sinking he claims the next day, other evidence strongly refutes that occurrence as described by Carman, as shown by the testimony of Klopman, Aucoin, Limeburner, Harris, and Carman himself.

39. In Count III Plaintiffs rely on Coverage A's premise that only losses "from any accidental cause" are covered:

> "Accidental" is synonymous with "fortuitous."  *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1202 (1st Cir. 1994) ("The courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.") (internal quotations and citations omitted).

*Markel American Ins. Co.*, 691 F.Supp.2d at 265.

40. Barring the involvement of another vessel, for which there is no evidence, it is the conclusion of this Court that Carman has repeatedly misrepresented himself and somehow managed to keep his boat afloat, purposefully sinking it somewhere close to his ORIENT LUCKY retrieval location.  It was no accident.  As the September 18 sinking evolution was described by Carman, Klopman's testimony shows it is non-sensical. Aucoin, familiar with Carman's boat from Point Judith, did not see it or a life raft in Block Canyon where he was fishing on PRUDENCE mid-day Sunday September 18, 2016. WHOI's Limeburner established that September 18-25 winds and currents on the shelf break south of New England would have precluded Carman's life raft drift from Block Canyon to the ORIENT LUCKY rescue location, confirmed by Aucoin's own observations as a commercial fisherman.  And MGH Dr. Harris convincingly testified that after seven wet days in the life raft Carman would have been in dire need of medical attention due to exposure, with gross and fine motor skill deficits in no way consistent with ORIENT LUCKY's video and photos of him.  Carman has concealed information from Plaintiffs and misrepresented himself since his October 19, 2016 written statement.  For these reasons, the Court concludes that Carman's trial testimony

was not credible and the sinking of his boat was intentional and not accidental.  Under Count III Plaintiffs properly denied coverage as the sinking was not "accidental" and under Count V Plaintiffs properly denied coverage under Exclusion F because the sinking was "caused intentionally by, with the knowledge of, or resulting from criminal wrongdoing" by Carman.

**Affirmative Defense 88**
*Fraud and Concealment*

41. That Carman intended to sink the boat for its $85,000 hull insurance proceeds is reinforced by the connection the Court finds between his grandfather's murder, *see* Fed. R. Evid. 404(b)(2) (admissible for proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident"); *United States v. Robles-Alvarez*, 874 F.3d 46, 50-51 (1st Cir. 2017) ("'intrinsic'" evidence admissible as a "'necessary description of the events leading up to'" and "'completing the story'" and "'not substantially outweighed by the danger of unfair prejudice'" under Fed. R. Evid. 403); *United States v. Fields*, 871 F.2d 188, 194 (1st Cir. 1989) ("'necessary to complete the picture'"); and his mother's death at sea, with Carman's common motive to accelerate his inheritance of the multi-million dollar ¼ interest in the Chakalos Family Dynasty Trust the common motive in both deaths.

42. The allegations by Plaintiffs detailed in their second amended Affirmative Defense ¶ 88 is supported by the evidence provided at trial.  Carman's amended counterclaim, ECF No. 12 at 10-32, including his insurance claim, *id.* at 17, are denied

and barred by fraud[11] because his boat's sinking was not accidental or fortuitous, ECF

No. 1 ¶ 36 and ¶ 38, and/or was caused intentionally by, with the knowledge of, or

resulting from criminal wrongdoing by Nathan Carman," *id.* ¶ 37.  The Yacht Policy, Ex.

25.8 at Page 8 of 9, states:

> **Fraud and Concealment**
>
> There is no coverage from the beginning of this policy if
> "**you**" or "**your**" agent has omitted, concealed,
> misrepresented, sworn falsely, or attempted fraud in
> reference to any matter relating to this insurance before or
> after any loss.

His Policy's Vermont Endorsement, *id.* at VT96 Rev 06/14 3 of 4, states:

> **Fraud and Concealment** is amended to read:
>
> If you or your agent has omitted, concealed, misrepresented,
> sworn falsely, or attempted fraud in reference to any matter
> relating to this insurance before or after any loss coverage
> may be denied and the policy cancelled.

Also,

> We may cancel for…Material misrepresentation or fraud by
> you with respect to any material fact affecting this policy or in
> the submission of any claim under this policy…

Similarly, under general maritime law, Vermont state law, and any other law of fraud

applicable here, insurance coverage for the sinking of Nathan Carman's boat and any

other claims related to it are denied and barred.  The Court concludes that based on the

weight of the evidence and Carman' demeanor at trial that he not only fraudulently

attempted to obtain $85,000 hull insurance proceeds from the sinking but he also

---

[11] "While [all-risk policies] are not 'all loss' policies and contain express and implied exclusions, 'recovery
under an all-risk policy will generally be allowed, at least for all losses of a fortuitous nature, in the
absence of fraud, or other intentional misconduct of the insured, unless the policy contains a specific
provision expressly excluding the loss from coverage.'"  *Markel American Ins. Co.*, 691 F.Supp.2d at 265.

intended to accelerate receipt of his inheritance from his  grandfather and through his mother as the evidence shows, chronologically:

(a) While his maternal grandmother was in hospice, on November 11, 2013 Carman purchased a Sig Sauer 716 Patrol Rifle, Serial No. 22C012970, from Shooters Outpost in Hooksett, NH for $2,099.99 cash.  Based on Carman's own testimony in this case and adverse inferences against him in civil litigation due to his invoking the Fifth Amendment of the U.S. Constitution, *S.E.C. v. Caramadre*, 717 F.Supp.2d 217 (D. R.I. 2010), plus other evidence, he and the Sig Sauer were more likely than not involved in his grandfather's murder on the night of December 19/20, 2013.  The Sig Sauer rifle was capable of firing the same caliber rounds which killed his grandfather and Carman was the last known person to see him alive.  In the morning Nathan Carman went fishing on a head boat out of Point Judith, RI, jettisoning his Sig Sauer rifle which now lies at the bottom of the sea.  Because he no longer has possession, custody, or control of the Sig Sauer rifle, he did not produce it in his home state of Vermont during his October 30, 2018 deposition and it is unavailable for ballistics testing.  After the murder Nathan Carman also destroyed his laptop's hard drive and his truck's GPS.  He lied to the Windsor Police Department during questioning about his Sig Sauer purchase.  Following the murder, he obtained unrestricted access to at least $560,000.

(b) Lacking gainful employment or educational pursuit, Nathan Carman then engaged in a similar scheme with chilling parallels.  Using part of those monies, in December 2015 at the age of 21 he purchased a 31 foot diesel boat for $48,000.  He insured it with Plaintiffs, first registering it in New Hampshire.  Upgrading the boat, he increased its insured value to $85,000 on March 25, 2016.

(c) On April 26, 2016 Nathan Carman failed to open a salt water cooling water seacock and overheated the boat's diesel engine while inside the Point Judith Harbor of Refuge.  He called 911, with emergency assistance provided by the U.S. Coast Guard, and made an insurance claim, getting his engine replaced under the terms of his policy.

(d) During the summer of 2016 Nathan Carman removed two forward structural bulkheads from the boat, thereby also diminishing its buoyancy.  During September 2016 the boat experienced recurring electrical problems with its forward/port bilge pump, which Carman replaced on September 17, 2016 without ever testing the boat's aft/starboard bilge pump.  That afternoon and evening he also removed two trim tabs from the transom, thereby opening four ½ inch diameter thru-hull holes for the trim tabs' hydraulic actuators, just above the waterline and below the scuppers (which had outboard baffles).  Using an electric hole saw, he then increased the size of those four holes to half dollars or larger and he failed to properly seal them.  All this made the boat unseaworthy.

(e) In this Carman-inflicted unseaworthy condition the boat departed Ram Point Marina several hours later, around 11:12 p.m., with Carman and his mother aboard.  He testified they first fished for stripers southeast of Block Island but that is contradicted by his first written report on the sinking and data from his mother's cell phone southwest of Block Island.

(f) Testifying they then went about 80 miles south of Block Island to fish for tuna and billfish in Block Canyon off the Continental Shelf -- for the first time ever -- Carman claims that while trolling north at 4-6 knots around midday he discovered the boat's bilge suddenly full of water.  He instructed his mother to reel in the lines but he neither

gave her a life vest nor told her the bilge was flooded. Despite the boat's open deck design, he never saw, spoke with, or heard from her again and as with his grandfather, Carman was the last person to see her alive.

(g) Carman immediately prepared to abandon ship and then had three opportunities in the pilothouse to summon help by using the VHF radio or setting off the EPIRB, both of which he installed, but he did not. This contrasts with his previous April distress call while inside the Point Judith Harbor of Refuge.  He disingenuously testified the reason he did not place a distress signal 100 miles from port in offshore ocean waters 140 fathoms deep with a bilge full of water was that he would only do so when in jeopardy of losing life or limb.  He claims there were no vessels nearby but F/V PRUDENCE Captain Alex Aucoin contradicted that.  Carman goes on to claim his boat quickly sank bow first, but if true, that would only be possible given his prior removal of the forward bulkheads.

(h) Along with the sunken boat, its electronic navigational equipment went missing, just like Carman's Sig Sauer rifle and his truck's GPS after his grandfather's murder.  Also, Carman says he kept the forward/port bilge pump he took out the day he departed onboard as a backup, so it too has gone missing as evidence.

(i) Carman testified his life raft automatically deployed and he was able to swim and get inside with his survival gear, including 30 days of food and a water maker.  The life raft then drifted in the winds and seas for seven days, he claims, until he was miraculously rescued by a Chinese ship passing just 30 yards from him, the ORIENT LUCKY, on September 25, 2016 about 42 miles southeast of where he testified his boat sank in Block Canyon.  Cold and wet during that claimed ordeal, video nevertheless

shows Carman swimming toward ORIENT LUCKY and climbing its steep gangway without apparent difficulty or any need for medical attention, which MGH Dr. Harris found improbable. Carman's seven day life raft story is further deflated by WHOI Limeburner's analysis showing that if deployed at the Block Canyon location where the boat allegedly sank, the life raft could not have drifted 42 miles southeast but rather would have drifted in the opposite direction, about 42 miles northwest, and if it had it would have been seen by Coast Guard search and rescue aircraft on September 19, 2016.

(j) In Carman's initial October 19, 2016 written description of his boat's sinking to BoatU.S. in support of his hull insurance claim he failed to mention anything about his removal of the forward bulkheads, anything about electrical problems and his replacement of the forward/port bilge pump, or anything about his removal of the trim tabs exposing transom holes which he enlarged and inadequately sealed.  These actions materially increased the risk of the boat's sinking and Nathan Carman breached his policy by not reporting them to Plaintiffs before departing and/or in his October 19, 2016 written description.

(k) Carman's false reporting to BoatU.S. and false testimony precluded Plaintiffs' and others' efforts to recover the sunken boat and their ability to inspect it and the unseaworthy alterations he made to it in furtherance of his fraudulent marine insurance claim so that he might obtain $85,000 in hull insurance proceeds.  Similarly, Nathan Carman attempts to mislead Plaintiffs and others into concluding he did not criminally cause his mother's death and is entitled to her multi-million dollar, ¼ share in the family trust.

(l) In sum, Carman executed a common scheme with striking, chilling, parallel losses of evidence, omissions, concealments, misrepresentations, false testimony, and fraud to procure a multi-million inheritance with involvement first in his grandfather's murder and second by causing his mother's death at sea through the sinking of his boat which Carman intentionally, knowingly, and/or criminally rendered unseaworthy in a further effort to claim its $85,000 hull insurance proceeds.  Carman has thereby caused injury to Plaintiffs who continue to incur attorneys' fees and costs in denying his fraudulent insurance claim. Therefore, this Court declares Carman's Policy cancelled and void as of September 17, 2016 and that all coverages under it were properly denied by Plaintiffs.

**Counterclaim, Counts I and II**
*No breach of contract by Plaintiffs*

43. There is no merit to Carman's counterclaims that Plaintiffs breached the insurance contract.  His contention that his policy is defined as described in Counterclaim ¶¶ 29, 30, and 46, *see* ECF No. 12 ¶ 51, ignores the fact that the Insurance Quotation referenced in ¶ 29 and the Marine Insurance Binder referenced in ¶ 30, and attached as ECF Nos. 12-1 and 12-3 to his Counterclaim, clearly state they are subject to standard policy limits, warranties, exclusions, terms, conditions, and limitations.  The actual policy language was available for Carman to obtain from BoatU.S. and was also on file with the Vermont Division of Insurance.

44. The Court finds instead that the terms of Policy No. 3985989-15 are as contained in the envelope mailed to Carman with Pellerin's December 23, 2015 cover letter, and supplemented by the March 25, 2017 Endorsement increasing the boat's

agreed value to $85,000.

45. As stated above, Plaintiffs properly denied coverage under the Policy.  Thus there was no breach of the parties' insurance contract by Plaintiffs.  Counterclaim Counts I and II are dismissed with prejudice.

**Counterclaim, Counts III and V**
*No bait and switch*

46. Carman alleges under maritime law and various state laws that Plaintiffs engaged in unfair and deceptive practices amounting to an unspecified "bait and switch."  These allegations, however, ignore that before Carman's sinking claim, Plaintiffs had just paid his $33,489.33 claim under the Policy without depreciation for a replacement diesel engine after he admitted not opening the raw water sea cock prior to its April 26, 2016 overheating.  With his $24 BoatU.S. Membership Fee he also received a TowBoatU.S. Rhode Island tow worth $490.  FF 12g.  That refutes anything unfair or deceptive.  Neither on the facts of Carman's sinking claim is there anything unfair or deceptive in Plaintiffs' denying it.  Counterclaim Counts III and V are dismissed with prejudice.

**Counterclaim, Counts IV and VI**
*No unfair claim settlement practices*

47. In light of the Court's concluding that Carman fraudulently and intentionally sank his boat, that it was not an accident, that he breached the negative warranty of seaworthiness, that his hole repairs were faulty, and that he concealed his material alterations to the boat and thereby increased the Plaintiff insurers' risk, there were no unfair claim settlement practices here, under either maritime punitive damages law or Vermont law.  See *Bushey v. Allstate Ins. Co.,* 164 Vt. 399, 402, 670 A.2d 807, 809

(1995) (to establish a claim for bad faith under Vermont Law, "a plaintiff must show that (1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim."); *Murphy v. Patriot Ins. Co.,* 197 Vt. 438, 448, 106 A.3d 911, 919 (2014) ("Sloppy or negligent claims handling does not rise to the level of bad faith.")

48. That Martha Charlesworth of BoatU.S. started processing Carman's claim for payment while media reports swirled around him and before investigative findings were provided her by her own counsel further defeats Counterclaim Counts IV and VI. Moreover, there is no bad faith in Plaintiffs' promptly seeking judicial adjudication by way of this declaratory judgment action rather than forcing Carman to initiate suit to further his insurance claim. Counts IV and VI are dismissed with prejudice.

## CONCLUSION

For the reasons stated above, the Court grants Plaintiffs' Complaint for Declaratory Judgment, Counts I through VI, and dismisses with prejudice Defendant's Counterclaim, Counts, I through VI.

_____
United States District Judge

RESPECTFULLY SUBMITTED July 17, 2019

PLAINTIFFS

*/s/ David J. Farrell, Jr.*
David J. Farrell, Jr.
*Pro Hac Vice*
Liam T. O'Connell
*Pro Hac Vice*
Farrell Smith O'Connell LLP
2355 Main Street, P.O. Box 186
South Chatham, MA  02659
508.432.2121 x 15
sealaw@live.com

## CERTIFICATE OF SERVICE

I certify that on July 17, 2019 I filed these proposed findings and conclusions via the Case Management/ Electronic Case Filing System, through which a copy will be electronically delivered to all attorneys who are listed as registered participants in connection with this case.

*/s/ David J. Farrell, Jr.*